

# NUMBER 13-06-00038-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**CITY OF ALTON, CARTER & BURGESS, INC.,
TURNER, COLLIE & BRADEN, INC., AND
CRIS EQUIPMENT COMPANY, INC.,**            **Appellants,**

**v.**

**SHARYLAND WATER SUPPLY CORPORATION,**        **Appellee.**

### On appeal from the 206th District Court
### of Hidalgo County, Texas.

# OPINION ON REMAND

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Opinion on Remand by Justice Rodriguez**

This case involves an appeal from a judgment in a jury trial. It is before us on remand to address appellee Sharyland Water Supply Corporation's (Sharyland) negligence claim against appellants Carter & Burgess, Inc. (C&B), Turner, Collie &

Braden, Inc. (TCB), and Cris Equipment Company, Inc. (Cris) (collectively, the contractors).[1]  *See City of Alton, Carter & Burgess, Inc., Turner, Collie, & Braden, Inc. & Cris Equip. Co. v. Sharyland Water Supply Corp.,* 277 S.W.3d 132, 138–41 (Tex. App.—Corpus Christi), *aff'd in part, rev'd and rendered in part, and rev'd and remanded in part*, 354 S.W.3d 407, 424 (Tex. 2012).[2]  On remand, the contractors contend that there was no evidence to establish that (1) C&B or Cris owed a duty to Sharyland; (2) C&B breached any duty owed; and (3) C&B, TCB, or Cris proximately caused Sharyland to suffer any damages.  By a fourth issue, the contractors challenge the sufficiency of the evidence supporting the reasonableness of the jury's damages award.  We affirm in part and reverse and render in part.

## I.  BACKGROUND

In the early 1980s, Alton built a water distribution system and conveyed it to Sharyland in exchange for Sharyland's agreement to provide Alton residents with fresh water.[3]  In the 1990s, Alton received financing to construct a sanitary sewer system. Until the construction of the sewer system, Alton residents relied on a sewage disposal

---

[1] Since we handed down our original opinion on rehearing, appellant Cris Equipment Co., Inc. (Cris) has forfeited its charter and no longer exists.  Still, Cris has a right to be heard on appeal.  *See Vanscot Concrete Co. v. Bailey*, 853 S.W.2d 525, 526–27 (Tex. 1993) (per curiam) (holding that a corporation that had ceased to exist could nevertheless appeal a trial court's judgment against it); *see also Suntide Sandpit, Inc. v. H & H Sand & Gravel, Inc.*, No. 13-11-000323-CV, 2012 Tex. App. LEXIS 5870, at *12–13 (Tex. App.—Corpus Christi July 19, 2012, pet. denied) (memo. op.).

[2] The Texas Supreme Court either affirmed or reversed and rendered all issues involving the City of Alton; therefore, the City of Alton is not before this Court on remand.  *See Sharyland Water Supply Corp. v. Alton*, 354 S.W.3d 407, 412–15 (Tex. 2011).

[3] Other facts involved in this case are more fully set out in this Court's first opinion on rehearing and in the supreme court's opinion.  *See Sharyland Water Supply Corp.,* 354 S.W.3d at 410–12; *City of Alton, Carter & Burgess, Inc., Turner, Collie, & Braden, Inc., & Cris Equip. Co. v. Sharyland Water Supply Corp.,* 277 S.W.3d 132, 138–41 (Tex. App.—Corpus Christi), *aff'd in part, rev'd and rendered in part, and rev'd and remanded in part,* 354 S.W.3d at 424.

system that consisted of septic tanks and open ditches. Part of the septic system was built in the public right-of-way and another part connected the septic system from the public right-of-way to individual houses. For the public right-of-way phase, Alton retained the services of L.L. Rodriguez and Associates to design the system, TCB, an engineering company, to engineer and inspect the system, and C&B, an engineering company, to manage construction of the sewer system. Alton also hired Cris, a contractor, to build the system. Cris subcontracted with Grab Pipeline Services, Inc. to assist in the installation.[4] The construction of the sewer system was completed in 1999.

To reach the houses on one side of the street, the sewer lines had to pass over or under the water main. Beginning in late 1999 or early 2000, Sharyland dug up some of the sites where the sewer lines crossed the water main. Sharyland expressed a concern that service lines crossing over the water main (rather than under the water main) did not have the required separation distance from the water main and that the crossings were not "centered" so that joints in the sewer service lines were as far from the water main as possible. When Sharyland and Alton could not work out an agreement over the service line crossings, Sharyland filed this lawsuit against Alton and the contractors. Sharyland asserted, among other things, that it was a third party beneficiary of the construction contracts because the sewer lines at issue were constructed in a manner which was not in conformance with regulatory standards or with the industry, engineering, and common law standard of care to be taken when constructing new sewer lines in the proximity of water lines. Sharyland also alleged that Alton and the contractors acted negligently in

---

[4] The jury found no liability on the part of L.L. Rodriguez and Associates or Grab Pipeline Services, Inc., and those entities are not parties to this appeal.

3

violating the duties created in contract or in not fulfilling their statutory and common law duties created under the law.

The contractors generally denied Sharyland's claims. As to Sharyland's contract claim, the contractors specifically pleaded that Sharyland was not a third party beneficiary of any contract or agreement with Alton or any other entity. As to Sharyland's negligence claims, the contractors denied that they owed any legal duty to Sharyland and, if there was a legal duty, that their breach, if any, did not proximately cause damages. They claimed that section 317.13 of title 30 of the Texas Administrative Code, which sets out the design criteria for sewerage systems, did not apply to the service connections at issue. *See* 30 TEX. ADMIN. CODE § 317.13(1)(A)–(B), *repealed by* 33 Tex. Reg. 6938 (2008).[5] They also asserted that any damages were economic and, thus, barred by the economic loss doctrine.

The case was tried to a jury, which found that the contractors failed to comply with their contracts with Alton and that Sharyland was a third party beneficiary to all of the contracts. It also found the contractors negligent, proximately causing damages to Sharyland (C&B was found 20% responsible, Cris 40%, and TCB 40%). The jury awarded Sharyland past damages of $14,000 and future damages of $1,125,000 as the reasonable cost of repairs necessary to restore the property to its condition immediately before the injury. The trial court entered judgment against the contractors.

On appeal, this Court reversed and rendered judgment that Sharyland take

---

[5] "Section 317.13 was repealed and has since been substantially incorporated into section 217.53 of the Texas Administrative Code." *Sharyland Water Supply Corp.*, 354 S.W.3d at 421 n.27 (citing 30 TEX. ADMIN. CODE § 217.53; 30 TEX. ADMIN. CODE § 317.13(1)(B), *repealed by* 33 Tex. Reg. 6938 (2008)). For the purposes of this opinion, we will refer to former section 317.13 as the applicable section.

nothing on its breach of contract claims against the contractors because Sharyland was not a third party beneficiary to any construction contracts. *City of Alton,* 277 S.W.3d at 155. We also rendered judgment that Sharyland take nothing on its negligence claims against the contractors because Sharyland's water system had not been damaged, and with purely economic damages, the economic loss rule barred Sharyland's tort claims. *Id.* at 154.

Sharyland appealed to the Texas Supreme Court. *See Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 411–12 (Tex. 2011). Relevant to this appeal, the supreme court reversed our judgment on Sharyland's negligence claims against the contractors. *Id.* at 420. It concluded that "the economic loss rule[, which bars a party from recovering in negligence or strict liability for purely economic losses,] does not preclude Sharyland's negligence claim against [the contractors]" because Sharyland's water system was damaged. *Id.* In other words, the supreme court concluded that the economic loss rule did not apply because there were damages to Sharyland's water system. According to the supreme court, Sharyland's water system was damaged because,

> Sharyland's system once complied with the law, and now it does not. Sharyland is contractually obligated to maintain the system in accordance with state law and must either relocate or encase its water lines. These expenses, imposed on Sharyland by the contractors' conduct, were the damages the jury awarded. Costs of repair necessarily imply that the system was damaged, and that was the case here.

*Id.* And regarding "whether [the economic loss rule] should apply at all in a situation like this," the supreme court reasoned as follows:

> Merely because the sewer was the subject of a contract does not

5

mean that a contractual stranger is necessarily barred from suing a contracting party for breach of an independent duty. If that were the case, a party could avoid tort liability to the world simply by entering into a contract with one party.

*Id.* at 418–19.

In addition, Sharyland argued before the supreme court "that the contractors failed to maintain the required minimum distance between water lines and sewer lines, failed to center the sewer pipes, and negligently installed those pipes above the water lines in violation of section 317.13." *Id.* at 422. In response, the contractors contended "that section 317.13 applied purely to sewer mains, and not the residential sewer lines[, the only portions of Alton's sewer system] at issue here." *Id.* The contractors argued "that Sharyland's entire case hinged on the 317.13 violation, and without it, there is no basis for finding that the contractors were negligent." *Id.* at 421. The supreme court disagreed with the contractors' argument. It determined that, as a matter of law, section 317.13 unambiguously applied to all sewer lines in this case, including the residential sewer lines.[6] *Id.* at 423. It provided the following explanation:

---

[6] Section 317.13 provides, in relevant part, that,

The following rules apply to separation distances between potable water and wastewater plants, and waterlines and sanitary sewers.

(1) Waterline/new sewer line separation. When new sanitary sewers are installed, they shall be installed no closer to waterlines than nine feet in all directions. Sewers that parallel waterlines must be installed in separate trenches. Where the nine-foot separation distance cannot be achieved, the following guidelines will apply.

(A) Where a sanitary sewer parallels a waterline, the sewer shall be constructed of cast iron, ductile iron, or PVC meeting ASTM specifications with a pressure rating for both the pipe and joints of 150 psi. The vertical separation shall be a minimum of four feet between outside diameters. The sewer shall be located below the waterline.

Nowhere in chapter 317 were residential service connections excluded from the general meaning of "sewers" or "sanitary sewers." To the contrary, the breadth of the terms implies the definition that dictionaries give it: that is, underground pipes carrying domestic or industrial waste. We agree with the trial court that section 317.13 applied to the sewer lines in this case . . . .

*Id.*

The supreme court remanded the case to this Court to address the negligence issues involving Sharyland and the contractors, issues we did not reach in our earlier opinion. *See id.* at 424.

## II.    APPLICABLE LAW AND STANDARD OF REVIEW

### A.    Negligence

"Negligence arises when an actor breaches a legal duty in tort, and the breach proximately causes damages." *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 246 (Tex. 2008).

### 1.    Duty

Because the threshold inquiry in a negligence case is duty, Sharyland must first establish that the contractors owed a legal duty to it. *See Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995); *Yeager v. Drillers, Inc.,* 930 S.W.2d 112, 115 (Tex. App.—Houston

---

(B) Where a sanitary sewer crosses a waterline and the sewer is constructed of cast iron, ductile iron, or PVC with a minimum pressure rating of 150 psi, an absolute minimum distance of six inches between outside diameters shall be maintained. In addition, the sewer shall be located below the waterline where possible and one length of the sewer pipe must be centered on the waterline.

*See id.* at 421–22 (quoting 30 TEX. ADMIN. CODE § 317.13(1)(A)-(B), *repealed by* 33 Tex. Reg. 6938).

7

[1st Dist.] 1996, no writ) (holding that "duty is the threshold question in a negligence case"). A duty is a legal obligation that requires a defendant to conform to a certain standard of conduct to protect others against unreasonable risks. *See Midwest Employers Cas. Co. v. Harpole*, 293 S.W.3d 770, 776 (Tex. App.—San Antonio 2009, no pet.). "Actionable negligence presupposes the existence of a legal relationship between the parties through which the wrongdoer owed a duty to the injured party. The duty may be imposed by contract or, irrespective of privity of contract, by law." *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 233–34 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). Without a duty, the contractors cannot be held liable to Sharyland for negligence. *See Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006) (per curiam).

The existence of a duty is a question of law for the courts to decide from the essential, undisputed facts surrounding the occurrence in question. *Nabors Drilling*, 288 S.W.3d at 404; *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). The existence of duty is also a question of law when the evidence conclusively establishes the pertinent facts or when reasonable inferences can be drawn from those facts, as in this case. *See Bennett v. Span Indus., Inc.*, 628 S.W.2d 470, 474 (Tex. App.—Texarkana 1981, writ ref'd n.r.e.). In such instances, appellate courts review de novo a determination regarding whether a legal duty is owed. *Nabors Drilling*, 288 S.W.3d at 404.

### 2. Breach, Proximate Cause, and Damages

Sharyland must also establish that the contractors breached a duty owed and that their breach, if any, proximately caused damages. *See Hogue*, 271 S.W.3d at 246. On

appeal, the contractors complain that there was no evidence establishing breach, proximate cause, or that the cost of repairs was reasonable.

We will sustain a legal-sufficiency or no-evidence challenge if the record shows: (1) the complete absence of evidence of a vital fact; (2) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). When reviewing a no-evidence challenge, we view the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *Id.* at 807. The ultimate test for legal sufficiency is whether the evidence would enable reasonable and fair-minded people to make the finding under review. *Id.* at 827. In reviewing a no-evidence issue, the court indulges every reasonable inference in support of that finding. *Id.* at 822. However, a reviewing court cannot disregard undisputed evidence that permits only one logical inference. *Id.* at 814–15. Further, a finding may not be supported by mere suspicion or surmise. *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927–28 (Tex. 1993). And incompetent evidence is legally insufficient to support a judgment, even if admitted without objection. *City of Keller*, 168 S.W.3d at 812.

## B.    Admissibility of Expert Testimony

A two-prong test governs whether expert testimony is admissible: (1) the expert must be qualified, and (2) the testimony must be relevant and based on a reliable foundation. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 554 (Tex. 1995)[; *see* TEX. R. EVID. 702]. "If

9

the expert's scientific testimony is not reliable, it is not evidence." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 713 (Tex. 1997). Generally, courts review a challenge to the admission of expert testimony under an abuse of discretion standard. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). . . . "But a party may assert on appeal that unreliable scientific evidence or expert testimony is not only inadmissible, but also that its unreliability makes it legally insufficient to support a verdict." *Id.* . . . "[A] no-evidence review encompasses the entire record, including contrary evidence tending to show the expert opinion is incompetent or unreliable." [*Id.*] (citing *City of Keller*, 168 S.W.3d at 814).

> . . . .

> "Expert testimony lacking a proper foundation is incompetent, *City of Keller*, 168 S.W.3d at 813, and its admission is an abuse of discretion." *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 239 (Tex. 2010) (citing *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006)). . . . "The court's ultimate task, however, is not to determine whether the expert's conclusions are correct, but rather whether the analysis the expert used to reach those conclusions is reliable and therefore admissible." [*Id.*] (citing *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002)).

> . . . . "[I]f an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded." *City of Keller*, 168 S.W.3d at 813.

*U.S. Renal Care, Inc. v. Jaafar*, 345 S.W.3d 600, 606–07, 610 (Tex. App.—San Antonio 2011, pet. denied) (op. on reh'g).

## C.    Reasonableness of Cost of Repairs

A party seeking to recover costs of repair or completion must prove that the damages sought are reasonable and necessary. *McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012) (per curiam) (rendering judgment in a breach-of-contract case where there was no evidence to support the reasonableness of the remedial damages) (citing *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200 (Tex. 2004) (per curiam)); *see Allright, Inc. v. Lowe*, 500 S.W.2d 190, 191–92 (Tex. Civ. App.—Houston

[14th Dist.] 1973, no writ) (addressing the common-law principle that to establish the right to recover the cost of repairs made to property wrongfully damaged by another, a claimant ordinarily must prove that such repairs were necessary and the costs reasonable). "To establish that, the plaintiff must show more than simply 'the nature of the injuries, the character of and need for the services rendered, and the amounts charged therefor.'" *McGinty*, 372 S.W.3d at 627 (quoting *Dallas Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377, 383 (Tex. 1956)). "Instead, some other 'evidence showing that the charges are reasonable' is required." *Id.* (quoting *Gossett*, 294 S.W.2d at 383); *see Fort Worth Hotel Ltd. P'ship v. Enserch Corp.*, 977 S.W.2d 746, 762–63 (Tex. App.—Fort Worth 1998, no pet.) ("[M]ere proof of amounts charged or paid does not raise an issue of reasonableness and such amounts ordinarily cannot be recovered without evidence showing the charges were reasonable."). For example, expert testimony about estimates for repairs, testimony of the person making the estimates or performing the repairs, or approval of the repairs by a third party has been held sufficient to support an award of damages based on the cost of repairs. *See Ron Craft Chevrolet, Inc. v. Davis*, 836 S.W.2d 672, 677 (Tex. App.—El Paso 1992, writ denied); *Carrow v. Bayliner Marine Corp.*, 781 S.W.2d 691, 694 (Tex. App.—Austin 1989, no writ); *Liptak v. Pensabene*, 736 S.W.2d 953, 958 (Tex. App.—Tyler 1987, no writ); *see also Allright, Inc.*, 500 S.W.2d at 191–92 (requiring evidence of the reasonable cost of repairs, placement parts, towing, and storage to recover and restore appellee's car that was recovered in a damaged condition after it was stolen from a parking lot negligently operated by appellant). However, an estimate without the testimony of the person who made it or other expert

11

testimony is no evidence of the necessity of the repair or the reasonableness of the cost of the repair. *Jordan Ford, Inc. v. Alsbury*, 625 S.W.2d 1, 3 (Tex. Civ. App.—San Antonio 1981, no writ); *see Carrow*, 781 S.W.2d at 694 ("When the expert who prepared the estimate of repairs does not testify, the jury has no basis on which to evaluate the estimate.").

## D.    Law of the Case

The "law of the case" doctrine is the principle by which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages. *Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 596 (Tex. 2006); *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986); *see City of Mission v. Cantu*, 89 S.W.3d 795, 809 n.21 (Tex. App.—Corpus Christi 2002, no pet). "[W]e are bound to follow the expression of the law as stated by the Texas Supreme Court." *Cantu*, 89 S.W.3d at 809 n.21; *see Ianni*, 210 S.W.3d at 596; *Hudson*, 711 S.W.2d at 630.

In this case, the supreme court agreed with this Court that "Sharyland was not a third party beneficiary of the agreement between Alton and the contractors," noting that Sharyland is not "mentioned in the contracts" and concluding that there was no "evidence that Alton and the contractors intended to confer a direct benefit on Sharyland." *Sharyland Water Supply Corp.*, 354 S.W.3d at 421. In addition, because Sharyland's claim for attorney's fees against the contractors was based on its third party beneficiary theory [and not on its declaratory judgment action], the court concluded that "Sharyland may not, therefore, recover its attorney's fees against the contractors."[7]  *Id.* at 423–24.

---

[7] Sharyland claims that this Court reversed and remanded the trial court's award of attorney's fees against the contractors for further determination and that the Texas Supreme Court affirmed this action.

The supreme court also concluded that "[m]erely because the sewer was the subject of a contract does not mean that a contractual stranger[, Sharyland,] is necessarily barred from suing a contracting party[, the contractors,] for breach of an independent duty." *Id.* at 419. In this regard, as an alternate basis for affirming this Court's reversal on the negligence claim, the contractors urged that the trial court incorrectly held that section 317.13 applied to the sewer lines in this case. *Id.* at 421. In fact, the contractors argued that "Sharyland's entire case hinged on the 317.13 violation, and without it, there is no basis for finding that the contractors were negligent." *Id.* In response, the supreme court construed section 317.13 as a matter of law and determined that it did apply "to the sewer lines in this case," which included service connections. *Id.* at 422–23.

In addition, the supreme court concluded that Sharyland's water system had been damaged because the "system once complied with the law, and now it does not." *Id.* at 420. It recognized that "Sharyland is contractually obligated to maintain the system in accordance with state law and must either relocate or encase its water lines," and that the "[c]osts of repair necessarily imply that the system was damaged." *Id.* at 420. The supreme court identified the following evidence of damage:

> Sharyland presented evidence that it experiences between 100 and 150 water system leaks each year. A break in the water line threatens

However, although we reversed and remanded "the award of attorney's fees for a determination of the amount of the award, if any, properly attributable to Sharyland's declaratory judgment," we did so in light of our discussion of Sharyland's claims against Alton. *See City of Alton*, 277 S.W.3d at 158. As to the contractors, we reversed and rendered "judgment that Sharyland take nothing for damages and attorney's fees on its contract claims and its negligence claims against C&B, TCB, and Cris." *See id.* And the supreme court concluded that "Sharyland may not, therefore, recover its attorney's fees against the contractors" because those fees were based on Sharyland's third party beneficiary theory, which the supreme court rejected, and not Sharyland's declaratory judgment action. *Sharyland Water Supply Corp.*, 354 S.W.3d at 423.

> contamination. There was evidence that when Sharyland excavated a representative sample of sixty-six sewer crossings, sixty of them had been illegally installed, and there was at least one leaking sewer pipe located six inches above a water pipe. There was also evidence that approximately 340 locations would require remediation.

*Id.* Because Sharyland suffered property damage, the supreme court further concluded the economic loss rule, which "does not govern here," "does not preclude Sharyland's negligence claim against [the contractors]." *See id.* at 420, 424. Finally, regarding damages, the supreme court concluded that "[b]ecause none of the contractors was attributed a percentage of responsibility greater than 50%, the proportionate responsibility statute" did not apply. *Id.* at 423–24.

Because the above is the law of the case, we are bound to apply it in this proceeding. *See Ianni*, 210 S.W.3d at 596; *Hudson*, 711 S.W.2d at 630.

### III. DISCUSSION

**A. Duty**[8]

#### 1. C&B

By the first issue, among other things, C&B contends that it owes no common law duty to Sharyland.[9] Relying on the proposition that the scope of any duty owed by C&B to Sharyland is determined solely by the contract between C&B and Alton, C&B asserts that the Texas Supreme Court has determined that the C&B/Alton contract did not create any duty owed by C&B to Sharyland. *See, e.g., Dukes v. Philip Johnson/Alan Ritchie, Architects, P.C.,* 252 S.W.3d 586, 594–95 (Tex. App.—Fort Worth 2008, pet. denied)

---

[8] On remand, TCB does not challenge the duty element of Sharyland's claim.

[9] Because our common-law analysis is dispositive of this issue, we need not analyze C&B's remaining claims challenging the duty element. *See* TEX. R. APP. P. 47.1.

(concluding, in a summary judgment proceeding, that, because there was no evidence that the contract between architects Johnson/Ritchie and the City and the contract between consultants Johantgen and Johnson/Ritchie required either party to report or make safe any hazards detected or to provide a safety review to the City regarding the Water Gardens where the Dukes' family members died, they owed no duty to the Dukes); *Romero v. Parkhill, Smith & Cooper, Inc.*, 881 S.W.2d 522, 527 (Tex. App.—El Paso 1994, writ denied) (determining that nothing in the contract between the city and the engineer gave the engineer the right to control the construction, and accordingly, the engineer did not have a duty of care to an employee of a subcontractor to keep the premises safe); *see also Graham v. Freese & Nichols, Inc.*, 927 S.W.2d 294, 295 (Tex. App.—Eastland 1996, writ denied) (concluding, in a summary judgment context, that "[a]ppellee's contract reflects that appellee had no duty regarding safety at the work site"). In this case, however, the supreme court only determined that Sharyland was not a third party beneficiary to the C&B/Alton contract. *Sharyland Water Supply Corp.*, 354 S.W.3d at 421. It did not determine that C&B owed no duty to Sharyland under a tort theory, as C&B argues. Instead, it remanded the negligence issues to this Court, the first of which is to determine whether C&B owed a duty to Sharyland. *See id.* at 424.

In support of its argument that C&B owes no common-law duty to Sharyland, C&B cites *Harpole* for the proposition that courts apply the risk-utility test in deciding whether a common-law duty exists. *See* 293 S.W.3d at 779. C&B generally identifies the following factors courts consider when applying the risk-utility test: risk; foreseeablity; likelihood of injury, balanced against the social utility of the actor's conduct; the

15

magnitude of the burden of guarding against the injury; and, the consequences of placing this burden on the defendant. *Id.* C&B notes that when these factors are balanced, the most important factor to consider is the foreseeability of the risk. *See Harpole*, 293 S.W.3d at 779. Apparently developing its discussion of foreseeability, C&B directs this Court to another factor that courts consider in determining duty—whether a party had the duty to control the conduct of the person who caused the plaintiff's alleged injury. *See Graff v. Beard,* 858 S.W.2d 918, 920 (Tex. 1993); *Black + Vernooy Architects v. Smith,* 346 S.W.3d 877, 892 (Tex. App.—Austin 2011, pet. denied) (en banc). C&B concisely argues that the evidence does not establish that, as project manager, it had the right to control the manner or method of the construction of the sanitary sewer system, so it owed Sharyland no common-law duty. *See Black + Vernooy Architects,* 346 S.W.3d at 892 (concluding that the architectural firm did not owe a common-law duty to injured third parties because it did not have the right to control the construction of the balcony through its contract with the homeowner). We disagree.

C&B's Project Management contract with Alton stated that C&B's scope of services included the following:

> Task 3.
>> Assure that the project complies with all local, state, and federal regulations relevant to the planning, and construction of a wastewater collection and transmission system; [and]
>
> . . . .
>
> Task 12.
>> Review the Engineer's recommendation for the Resident Project Inspector and advise the Owner . . . .

C&B contends that the Alton/C&B contract did not obligate C&B to inspect

construction or completed work.   It urges that the contract only obligated C&B to review the engineer's recommendation for a project inspector, as directed by Task 12, and therefore, its responsibilities under Task 3 related only to the various documents comprising the design drawings for the project and to confirm that a competent design engineer and a competent resident inspector had been engaged.   Based on this reasoning, C&B asserts that the agreement imposes no duty to direct, oversee, or inspect construction of the sewer project.

The unambiguous language of Task 3 expressly states C&B will assure that *the project*, not just the design drawings, complies with all relevant regulations.   It is apparent that the scope of C&B's duty, as set out in Task 3, included making certain that the construction of all aspects of the project was in conformance with the law, engineering standards, and industry standards.   *See Milner v. Milner*, 361 S.W.3d 615, 619 (Tex. 2010) (citing *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009) (per curiam)) (setting out that if the language of a contract can be given a certain and definite meaning, it is not ambiguous and the contract's construction is a matter for the court).   We cannot conclude that Task 3 relates only to documents comprising the project's design drawings, as C&B argues.   The language is not that narrow; the intent of the parties as expressed in this scope of services provision is clear. In addition, the method by which C&B was to assure conformance is not set out in the contract.   Therefore, even though another party inspected the property and, through Task 12, C&B was to review TCB's recommendations for that resident project inspector and to advise Alton, we cannot conclude that Task 12 discharged C&B's duty to make

17

certain the project complied with all state regulations, among other things. An on-site inspection is not the only method by which C&B could have assured construction conformance, as C&B's argument suggests.

Moreover,

> [t]he fact that an act is induced by and done pursuant to a contract does not shield it from regular tort liability. One who undertakes to perform a contract assumes a duty to all persons to take reasonable care not to injure them or their property in the performance of that contract, and one who is not privy to the contract may assert a claim for negligence for a breach of that duty. *Thomson* [*v. Espey Huston & Assoc.*], 899 S.W.2d [415,] 421 [(Tex. App.—Austin 1995, no writ)] (citing *Sw. Bell Tel. Co. v. Delanney*, 809 S.W.2d 493, 494 (Tex. 1991) (op. corrected at 34 Tex. Sup. Ct. J. 749)).

*Goose Creek Consol. Indep. Sch. Dist. of Chambers v. Jarrar's Plumbing*, 74 S.W.3d 486, 494 (Tex. App.—Texarkana 2002, pet. denied) ("[T]he injury Goose Creek alleged, the invasion of sewage and sewer gas into the school buildings, constitutes an injury to property that was not the subject matter of the [plumbing] contract [between Lewis and Jarrar's Plumbing] .... Jarrar's Plumbing owed an independent tort duty to use reasonable care in the performance of the contract to install the plumbing so as not to injure persons or property, and Goose Creek alleged that such injury to property was caused by the failure to use such reasonable care. Therefore, Goose Creek properly maintained a tort action for negligence against Jarrar's Plumbing . . . ."); *Thomson*, 899 S.W.2d at 421–22 (finding that, absent clear evidence to the contrary, a property owner is not a third party beneficiary to a contract between a contractor and a subcontractor and therefore cannot sue on the contract, but that the property owner may assert a claim for negligence against a subcontractor based on the subcontractor's performance under the contract where the cause of action is independent of the duties imposed by the contract).

18

In this case, the Alton/C&B contract imposed a contractual duty on C&B to perform specified services for Alton; those services included assuring that the project complied with all state regulations relevant to the construction of Alton's sewer system. *See Milner*, 361 S.W.3d at 619 (citing *Chrysler Ins. Co.*, 297 S.W.3d at 252); *Bennett*, 628 S.W.2d at 474. At the same time, in undertaking to perform its contract with Alton, C&B had an independent duty to take reasonable care not to injure Sharyland's property—not to negligently damage Sharyland's sewer system. *See Goose Creek Consol. Indep. Sch. Dist. of Chambers*, 74 S.W.3d at 494 (citing *Thomson*, 899 S.W.2d at 421) (citing *Delanney*, 809 S.W.2d at 494)). If, as Sharyland alleges, incompetent services on the part of C&B damaged its water lines, then C&B may be liable for that negligence in tort. *See id.*

### 2. Cris

Also by this first issue, Cris asserts that it owed Sharyland no legal duty in the construction of the sewer system at issue in this case. The only argument Cris makes for this contention is that section 317.13, the regulation upon which Sharyland relies, "does not apply to the service connections [at] issue in this case. Therefore, that regulation cannot be the basis of any duty upon which a finding of negligence against Cris may be premised." However, the Texas Supreme Court concluded that section 317.13 does apply "to the sewer lines in this case," which includes the service connections. *Sharyland Water Supply Corp.*, 354 S.W.3d at 422–23. The law of the case applies, and this argument fails. *See Ianni*, 210 S.W.3d at 596; *Cantu*, 89 S.W.3d at 809 n.21.

And one of the conditions of Cris's contract with Alton provided that Cris "shall

19

observe and comply with *all* . . . State . . . regulations which in any manner affect the conduct of the work." Also incorporated into the contract was Cris's assurance to the "Texas Water Development Board that it would construct Alton/McAllen Waste Water Improvement project at Alton, Texas, in accordance with sound construction practice, all laws of the State of Texas, and the rules of the Texas Water Development Board." Thus, the Alton/Cris contract imposed a contractual duty on Cris to perform specified services for Alton; services that included observing and complying with all relevant state regulations. In undertaking to perform its contract with Alton, Cris had an independent duty to take reasonable care not to injure Sharyland's property—not to negligently damage Sharyland's sewer system. *See Goose Creek Consol. Indep. Sch. Dist. of Chambers*, 74 S.W.3d at 494 (citing *Thomson*, 899 S.W.2d at 421) (citing *Delanney*, 809 S.W.2d at 494)). If, as Sharyland alleges, Cris's incompetent construction services damaged its water lines, then Cris, too, may be liable for that negligence in tort.

### 3. Summary

We overrule the first issue, which challenges the duty element of negligence.

## B. Breach

By a second issue, only C&B challenges the breach element of Sharyland's negligence claim; TCB and Cris do not.[10] Recognizing that "Texas law restricts evaluations of C&B's activities in this case to the contractual duties [it] assumed in its contract with Alton," C&B contends that Sharyland's experts, Randy Winston and William

---

[10] TCB does not challenge the breach element. And although Cris generally challenges the sufficiency of the evidence to support a negligence finding, it addresses only duty and damages. Therefore, we need not address the breach element as to either TCB or Cris. *See* TEX. R. APP. P. 47.1.

20

Shea, could have had no reasonable basis for an opinion on C&B's duties under the Alton contract because neither Winston nor Shea read the Alton/C&B contract before trial. C&B asserts that any opinion Winston or Shea might have given on the breach of such duty was unreliable and, therefore, inadmissible. *See U.S. Renal Care, Inc.*, 345 S.W.3d at 606–07 (citing *Whirlpool Corp.*, 298 S.W.3d at 638). C&B further contends that the unreliability of the evidence makes it legally insufficient to support a verdict. *See id.*

Although it is undisputed that neither expert read the Alton/C&B contract before trial, the evidence establishes that each expert had years of experience working in this area, taking bids and awarding contracts for similar construction. Sustaining C&B's objections, the trial court did not allow Winston to testify about the Alton/C&B contract. Rather, the trial court allowed Winston to testify generally regarding other contracts and other projects.

We also note that the trial court admitted, without objection, the sewer system contracts between each contractor or engineer and Alton. And from the C&B/Alton contract, Winston read the following language included in its Scope of Services, Task 3: C&B would "assure that the project complies with all local, State, and federal regulations relevant to the planning and construction of a wastewater collection and transmission system." Winston and Shea also testified that section 317.13, a sewer system regulation, applied in this case. The supreme court affirmed this conclusion. *See Sharyland Water Supply Corp.*, 354 S.W.3d at 423.

The trial court also allowed Shea to provide, over objection, the following testimony about C&B's contract with Alton:

Q. Mr. Shea, my question to you is this: What was your understanding of the contract that [C&B] had with the City of Alton?

A. As—as a project manager, they would have had overall supervision of the work in progress. They would have been responsible for seeing that the work was done properly, it was done on time, the payments were made for the appropriate work that was done. And so they have to have a working knowledge of—of the—the project and—and what its progress is and to make sure that—that all the rules governing that type of work with—with the public utility is observed.

Q. Assume with me that their contract provides that they will ensure that the project complies with all local, State[,] and federal regulations relevant to the planning and construction of a wastewater collection and transmission system and that it further provides that they will act as the owner's representative in the administration of construction contracts. And based upon your review of the photographs that we went through earlier out of Exhibit 1, do you have an opinion as to whether or not they met their responsibilities under the contract with Alton?

. . . .

Q. Mr. Shea, my question was: Do you have an opinion?

A. Yes, sir.

Q. Can you tell us what your opinion is?

. . . .

[A.] My opinion is that if—in regard to the sewer service connections, and in particular the ones that I observed from the excavations that were made, the —work was not done properly or according to the plans and specifications.

Q. Okay. And with respect to—did they meet their requirements under their contract with Alton?

. . . .

A. I don't—I don't believe that they fulfilled their duties entirely in regard to the project and—concerning particularly the sewer service

22

connections that I observed.

Q. . . . . Assume with me that their contract provides that they will ensure that the project complies with all local and State and federal regulations with a wastewater—and also assuming that their contract provides that they would act as an owner's representative in the administration of the construction contract. And again, based on your review of the—of the photographs and your understanding of the Texas Engineering Practices Act, do you believe—what is—do you have an opinion with respect to whether or not Carter & Burgess met its responsibilities to the public?

. . . .

Q. Mr. Shea, do you have an opinion?

A. Yes, sir, I do.

Q. What is your opinion?

. . . .

[A.] My opinion would be—my opinion is that Carter & Burgess did not entirely fulfill their duties under this contract if they were knowledgeable of this—the manner in which these sewer service connections were being installed in this—in the vicinity of existing water lines.

Shea based his opinions, not on the reading of a particular contract between C&B and Alton, but on assumptions. And there is no evidence that the assumptions were unfounded. *See City of Keller*, 168 S.W.3d at 813.

We cannot conclude that Winston and Shea had no reasonable basis for their opinions regarding C&B's duties under the Alton contract, as C&B argues. *See id.* Rather, the analysis each expert used to reach his conclusions on the breach of such duty was reliable and, therefore, admissible. *See TXI Transp. Co.*, 306 S.W.3d at 239 (citing *Exxon Pipeline Co.*, 88 S.W.3d at 629). We conclude that the trial court did not abuse its

23

discretion in admitting the testimony of Winston and Shea. *See id.* (citing *Cooper Tire & Rubber Co.*, 204 S.W.3d at 800).

We also note that engineers employed by the Texas Natural Resource Conservation Commission (TNRCC) testified, through deposition testimony, that the sewer system was not constructed as required by section 317.13. For example, TNRCC engineer Louis C. Herrin testified that "[o]n separation distances [between the sewer line and the water line,] it would not meet the separation distances as specified in 317. . . . The separation distances are too close." C&B assured, through its contract with Alton, that the project would comply with all state regulations relevant to the planning and construction of a wastewater collection and transmission system. This compliance would include section 317.13.

Thus, viewing the evidence in the light favorable to the finding, we find more than a scintilla of evidence that C&B, the engineering company that managed the construction of the sewer system, disregarded the appropriate criteria for installation of new sewer lines in the proximity of waterlines, a requirement set out in its contract with Alton. *See City of Keller*, 168 S.W.3d at 807, 810. We conclude that the evidence would enable reasonable and fair-minded people to find that C&B breached the duty owed to Sharyland; the evidence is legally sufficient in this regard. *See id.* at 827. We overrule the second issue, which addresses the breach element.

## C. Proximate Cause

By the third issue, the contractors complain that there was insufficient evidence to establish that their actions proximately caused damages. Yet the Texas Supreme Court

24

expressly determined the following:

> Sharyland's [freshwater] system once complied with the law, and now it does not. Sharyland is contractually obligated to maintain the system in accordance with state law and must either relocate or encase its water lines. These expenses, imposed on Sharyland by the contractors' conduct were the damages the jury awarded. Costs of repair necessarily imply that the system was damaged, and that was the case here. Sharyland presented evidence that it experiences between 100 and 150 water system leaks each year. A break in the water line threatens contamination. There was evidence that when Sharyland excavated a representative sample of sixty-six sewer crossings, sixty of them had been illegally installed, and there was at least one leaking sewer pipe located six inches above a water pipe. There was also evidence that approximately 340 locations would require remediation.

*Sharyland Water Supply Corp.*, 354 S.W.3d at 420. We are bound by this determination, *see Ianni*, 210 S.W.3d at 596; *Hudson*, 711 S.W.2d at 630; *Cantu*, 89 S.W.3d at 809 n.21, and overrule the third issue, which challenges the proximate cause element of Sharyland's negligence claim.

## D. Reasonableness of Damages

By the fourth issue, the contractors argue that the damages award must fail because Sharyland offered no competent evidence that the cost of the repairs, past or future, was reasonable. The damages question on negligence asked the jury what sum of money would fairly and reasonably compensate Sharyland for its damages, if any, proximately caused by the contractors' negligence. That question had one damages element, "The reasonable cost of the repairs necessary to restore the property to its condition immediately before the injury."[11] The jury awarded Sharyland $14,000 for past

---

[11] The contractors do not contend that Sharyland did not prove the repairs sought were necessary. *See McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012) (per curiam). So that issue is not before us. *See* TEX. R. APP. P. 47.1.

repairs and $1,125,000 for future repairs.

**1.      Past Repair Costs**

The contractors first contend that Sharyland cannot recover for past costs of repair.   They argue that Sharyland has no past repair costs to recover, only investigative costs.   They further assert that even the investigative excavation costs were not proven reasonable.

Sharyland called Jim Stuhlman, a twenty-eight-year employee of Sharyland, to testify regarding past costs.   Stuhlman testified that, during his investigation, he excavated the locations in order to take photographs.   When asked what the costs were for the seventy crossings he investigated, Stuhlman provided the following answers:

Q.      . . . When you sent these crews out to investigate these sites, what did it cost?

A.      A guesstimate would be about $15,000.

Q.      Okay how much did it cost for each—each one?

A.      In the neighborhood of $200 to $250 for each one.

Q.      Okay.   Is that a pure guess or is that your estimate based on—

A.      It's a little of both.  We pay a contractor to—to do the work.  He charges us by the location.   That's $150 on each location, plus there is the time and vehicles of my own people while we're out there.

         . . . .

Q.      And for these 70 crossings that you dug up, what did he charge you on average?

A.      He charged—he charged us on average $150.

Q.      Okay.   In addition to that, what costs did Sharyland incur in terms of its own personnel?

26

A. That varied with each one because it depended how many people went out, how many vehicles were there, whether I went with everyone or not.

Q. On average, what did it cost?

A. Between $50 and $100.

. . . .

Q. In the cost that the corporation has expended in excavating, was there any money at all spent on—on repairing any perceived problem?

A. No.

Assuming without deciding that investigative or diagnostic costs are recoverable as repair costs, we agree with the contractors that Sharyland did not offer evidence of the reasonable cost of past repairs. Stuhlman based his estimate for the excavation costs on what a contractor charged Sharyland, "on average." This is the only testimony regarding the cost of past excavations. The jury simply heard Stuhlman suggest a number reached by someone else, without more. He did not tell the jury how the average contract charge of $150 to dig up each location may have been reached. The contract upon which the figure was based was not entered into evidence. There is no evidence showing that the contract charge of $150 was reasonable. *See Fort Worth Hotel*, 977 S.W. 2d at 762–63. In addition, Stuhlman provided general, not specific, information regarding Sharyland's personnel costs for each location—an average cost of between $50 and $100. Stuhlman never told the jury why his "guesstimate" of a total cost of $15,000 or why an amount "[i]n the neighborhood of $200 to $250 for each [excavation]" was reasonable. We conclude that this is no evidence that the charges

27

were reasonable. *See Mustang Pipeline Co.*, 134 S.W.3d at 201; *Fort Worth Hotel Ltd. P'ship*, 977 S.W.2d at 762–63 (concluding that the hotel owner failed to establish the right to recover costs of repairs after an explosion damaged the hotel because the hotel owner did not present sufficient evidence to justify the jury's finding that costs were reasonable and repairs necessary).

Viewing the evidence in the light favorable to the finding and indulging every reasonable inference in support of a reasonableness finding, we conclude the evidence, which is based on mere surmise, is not legally sufficient because it would not enable reasonable and fair-minded people to find that the cost was reasonable. *See City of Keller*, 168 S.W.3d at 807, 822, 827; *Browning-Ferris, Inc.*, 865 S.W.2d at 927–28. We conclude that Sharyland offered no evidence that the excavation costs awarded as past repairs in the amount of $14,000 were reasonable.

### 2. Future Repair Costs

The contractors also contend that Sharyland did not prove the reasonableness of future repair costs. TCB specifically asserts that "Winston, Sharyland's engineering expert, had no basis for his estimate of future repair costs because, at bottom, he relied on a single price quote, not competitively bid, that he and fellow engineer Shea randomly inflated." It also argues that "[t]he jury, therefore, had no basis for determining whether the future repair costs were reasonable." We disagree.

Here, Sharyland presented the testimony of its expert Winston, who had developed a repair estimate. Providing a detailed description of his method for calculating damages, Winston testified that he (1) utilized his past experience, (2) took

28

Shea's projected 2001 costs that were based on a contractor's information and some of Shea's known information on how to repair these lines, and (3) applied a price increase factor to determine what "a current figure would be to hire a contractor and have it done." On cross-examination, Winston responded to questions regarding the data from the contractor that he and Shea had used in developing their repair estimates. According to Winston, four years before trial, Shea asked DCR Demolition and Utility for an estimate of what it would cost to excavate a crossing and to encase a water main. Winston agreed that in response to Shea's inquiry, DCR estimated that it would cost $400 for each excavation and $2,000 per crossing, including the initial excavation, to encase the water main with a 10-inch split steel casing, and $1,700 for concrete. Shea increased the estimate for an excavation without repairs from $400 to $500; Winston testified he did not know how Shea arrived at the increased amount, but was "sure he used his engineering judgment and may have talked to other contractors. . . ."

Winston testified that approximately four years later, he took Shea's 2001 cost estimates and applied a price factor—"a 25 percent price increase"—to bring it to current prices due to, among other things, material and labor and the cost of fuel, all of which had "really escalated." Winston reported that his calculations resulted in an excavation cost of $625, plus an encasement cost of $2,500 for each water main that was in violation of the code. According to Winston, "[t]he $2,500 would reflect going in there and—and . . . welding up or taking a steel casing and going around the pipe, welding it up and then filling the pipe void, if I recall correctly, with concrete on the ends to seal the ends."

In calculating damages, Winston testified that, at the time the plans were drawn,

29

there were 440 sewer lines that crossed Sharyland's water line. According to Winston, after checking twenty-two crossings, they found seventeen, or 77 percent, that were in violation of the code. Of the 440 crossings, then, there would be 340 (77 percent) potentially violating code. Winston testified that, using a statistical model of a 95 percent competence level, he was approximately 95 percent confident that the number of violations would fall between 252 and 425, with a straight extrapolation or median number of 340 crossings in violation. In sum, using a sample of damages that were observed by digging up areas where the sewer lines crossed Sharyland's water lines, Winston calculated the percentage of violations requiring repairs at 77 percent with a 95 percent competence level and determined a range of crossing in violation from 252 to 425.

Based on these figures and cost calculations set out above, Winston projected that the total cost to dig up the 440 crossings to determine which crossings violated the code, at $625 each, would be $275,000. Winston testified that the total encasement cost of the projected 340 crossings that would be in violation of the code, at $2,500 each, which he acknowledged on cross-examination did not include excavating the crossing, would be $875,000, bringing the combined cost to $1,125,000.

During cross-examination, Winston was questioned regarding Stuhlman's testimony. As detailed above, Stuhlman testified that each excavation cost him $150 to dig, which, as defense counsel noted, is approximately one-fourth of what Winston estimated the excavation costs to be. Winston responded that the difference between Stuhlman's $150 cost and his $625 estimate "may be that they have got on retainer a company to do repairs in this type of work." At the request of defense counsel, using that

30

same calculation, Winston also determined that approximately one-fourth of his $2,500 estimate to repair the crossing in violation of the code would be $600. And using this lower calculation figure for uncovering all 440 crossings and fixing 250, the excavation cost would be $66,000 (440 times $150) and the repair costs, $151,200 (252 times $600), with a total cost of $217,200. On the high end, the excavation cost would remain $66,000 and the repair costs $255,000 (425 times $600), with a total cost of $321,000. With those numbers, Winston agreed that the range would be from $217,200 to $321,000.

On re-direct, with regard to the suggested $600 repair cost, Winston testified, over objection, that "[f]or the type of repairs needed to—to do what we're doing, there would be—I do not feel like there is any way to do it for the $600 per unit basis the [defense counsel] talked about." Again, over objection, when asked in his professional opinion whether he could think of a cheaper way to correct the problems he identified on Sharyland's water lines, Winston responded as follows: "[I]t is an expensive option but one that is necessary to correct Sharyland's water supply lines if the wastewater lines themselves are not corrected. This is one of the better alternatives to fix it because we would not be shutting down all the individual houses and large amounts of people on that water line. If we were cutting out water lines, lowering them, changing water line locations, that cost could be very high." Winston also testified that he believed that the $625 excavation figure was more reasonable than the $150 amount testified to by Stuhlman because "of the extensiveness and because of—of the amount that you'd have to dig to do [the type of excavation needed]. So that's why . . . [he] used that number."

31

Having the opportunity to consider this range of figures provided through Winston's testimony, the jury awarded $1,125,000 in future damages. The jury was presented with evidence that allowed it to assess the facts and award damages accordingly. Sharyland did not just present one amount for damages alone as evidence of the amount estimated. Sharyland provided expert testimony utilizing the DCR estimate that was secured and evaluated by Shea and factoring in, among other things, the investigation of the twenty-two sewer crossings, the types of available encasements, and the increased costs over time. This testimony revealed factors that were considered that ensured the reasonableness of the damages awarded by the jury. *See McGinty*, 372 S.W.3d at 628. Sharyland presented evidence from which the jury was able to infer reasonableness. *See Carrow*, 781 S.W.2d at 694. There was testimony about estimated costs for repairing damages to Sharyland's water system. These were damages that would be incurred in the future if Sharyland were to ensure that its water system complied with state regulations. Winston testified as to the number of crossings checked and the percentage found to be in violation, the number of crossings to be dug up, the estimated number of crossings to be repaired, and the estimated costs for digging up each crossing and making those repairs. Winston testified and was cross-examined. The evidence was before the jury, allowing the jury to infer the reasonableness of the estimates and to award future repairs in the amount of $1,125,000.

Based on the above, we conclude that the evidence is legally sufficient for reasonable and fair-minded jurors to find that the cost of future repairs awarded was reasonable. *See City of Keller*, 168 S.W.3d at 807, 822, 827; *Browning-Ferris, Inc.*, 865

32

S.W.2d at 927–28.

### 3. Summary

Having concluded that there was no evidence that the cost of past repairs was reasonable, we sustain that portion of the fourth issue. But having concluded that the evidence is legally sufficient to support the reasonableness of the amount of damages awarded for future repairs, we overrule that portion of the fourth issue.

## IV. CONCLUSION

We reverse and render that Sharyland take-nothing as to past damages and affirm the remainder of the judgment as to Sharyland's negligence claim against Carter & Burgess, Inc., Turner, Collie & Braden, Inc., and Cris Equipment Company, Inc.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the
30th day of May, 2013.