*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*



# OPINION

No. 04-08-00183-CV

**MIDWEST EMPLOYERS CASUALTY COMPANY**
on Behalf of Terry English,
Appellant

v.

Charles **HARPOLE**, Jim Carroll, Alan Kwast,
Albert Lopez, and Brock Pittman,
Appellees

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2008-CI-01410 (Severance from Trial Court No. 2006-CI-16714)
Honorable David A. Berchelmann, Jr., Judge Presiding

Opinion by:    Rebecca Simmons, Justice

Sitting:    Catherine Stone, Chief Justice
    Karen Angelini, Justice
    Rebecca Simmons, Justice

Delivered and Filed:  June 24, 2009

AFFIRMED

This appeal stems from the entry of a summary judgment, in favor of Appellees Charles

Harpole, Jim Carroll, Alan Kwast, Albert Lopez, and Brock Pittman (collectively the Referees),

based on the lack of duty owed to Brackenridge High School Coach Terry English.  Because the

Referees established, as a matter of law, that there was no genuine issue of material fact as to one

of the essential elements of Midwest Employers Casualty Company's (Midwest's) claims, and Midwest failed to bring forward a scintilla of probative evidence to raise a genuine issue of material fact, we affirm the judgment of the trial court.[1]

### STATEMENT OF FACTS

While officiating at a football game at Alamo Stadium, referee Charles Harpole ran into Brackenridge High School assistant football coach Terry English who sustained a serious head injury. According to the rules adopted by the San Antonio Independent School District (SAISD), a fifty-yard long and six-foot wide restricted area is designated in the middle of each sideline for the referees to use during live play. More *specifically*, the rule prohibits both coaches and players from being in the officials' box while the ball is in active play.[2] The rule allows the referees, specifically the line officials such as Harpole, to follow the play and mark the ball, by running unimpeded in a restricted area, free from encroachment by others. Immediately behind the restricted area is a six-foot wide region available for the coaches' use and designated as the "Coaching Box."

---

[1] Midwest provides worker's compensation insurance for SAISD and compensated Coach Terry English for lost wages and medical benefits. Additionally, due to his permanent disability, English will continue to receive these benefits indefinitely. Thus, pursuant to chapter 417 of the Texas Labor Code, Midwest Employers Casualty Company filed suit as subrogee of Terry English against the Referees seeking to recover for English's injuries. *See* TEX. LABOR CODE ANN. §§ 417.001-.003 (Vernon 2006) ("An employee or legal beneficiary may seek damages from a third party who is or becomes liable to pay damages for an injury or death . . . . [T]he insurance carrier is subrogated to the rights of the injured employee and may enforce the liability of the third party in the name of the injured employee or the legal beneficiary." *Id.* § 417.001(a)-(b)).

[2] The NCAA Rules governing Texas high school football provide:

Article 5.a:     While the ball is in play, coaches, substitutes and authorized attendants in the team area may not be between the sideline and the coaching line.

Article 1.b.1:     During the game, coaches, substitutes and authorized attendants in the team area shall not be on the field of play or outside the 25 yard lines without permission from the referee unless legally entering or leaving the field. Team area personnel who are outside the team area and who have involvement or impact on line or ball play are subject to penalty.



During the third quarter of the game, Referee Harpole, the head linesman for the game,[3] ran south down the restricted area and directly into the back of Coach English. All of the parties agree that the collision occurred in the restricted area of the field. When Harpole collided with English, Harpole's head slammed into the back of English's head. English lost consciousness and fell to the ground. English suffered Grade 3 brain injury and is permanently disabled.

Midwest filed suit and the Referees filed a general denial contending that they owed no duty to English, and that even if they owed him a duty, there was no evidence of a breach of that duty. Following over a year of discovery, the Referees filed a traditional motion for summary judgment and a no-evidence motion for summary judgment based on lack of duty. The trial court granted both motions on September 18, 2007, and this appeal followed.

---

[3] The linesman is responsible for marking the ball. At the time of the accident, Harpole was running along the sideline to mark the ball after the opposing team punted the ball.

**STANDARD OF REVIEW**

Midwest argues that summary judgment was improperly granted in favor of the appellees because Harpole was under a duty to act as a reasonable prudent person as he officiated the game, and that more than a scintilla of evidence was presented that Harpole, in particular, breached that duty by running "more aggressive[ly] than normal," "at full speed," and "faster than normal" without looking where he was going when he knew there were people in the area. Additionally, Midwest argues the Referees were under a duty to enforce the rules of the game, and that it presented more than a scintilla of evidence that the Referees breached that duty by permitting, and actually encouraging, coaches like English to work in the restricted area when the Referees knew it was dangerous. When a trial court's order granting summary judgment does not specify the ground or grounds relied on for the ruling, as is the case here, the "summary judgment will be affirmed on appeal if any of the theories advanced are meritorious." *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex. 1993).

**A. Traditional Motion for Summary Judgment**

We review a trial court's grant of a traditional motion for summary judgment de novo. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004). The standard of review for a traditional summary judgment is well established: (1) the movant must show "that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment," the court must take evidence favorable to the non-movant as true; and (3) the court must indulge every reasonable inference in favor of the non-movant and resolve any doubts in the non-movant's favor. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997) (citing *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985)); *see also Joe*, 145 S.W.3d at 157

("When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor.").

## B. No-Evidence Motion for Summary Judgment

"A no-evidence summary judgment is essentially a pretrial directed verdict," to which an appellate court applies a legal sufficiency standard of review. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003); *accord Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002). We view the evidence in the light most favorable to the non-movant and disregard all contrary evidence and inferences. *King Ranch*, 118 S.W.3d at 751; *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied). When a party moves for summary judgment under Rule 166a(i), asserting that no evidence exists as to one or more elements of a claim on which the non-movant would have the burden of proof at trial, the burden is on the non-movant to present more than a scintilla of probative evidence to raise a genuine issue of material fact on each of the challenged elements. *See* TEX. R. CIV. P. 166a(i); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004); *Wal-Mart*, 92 S.W.3d at 506. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch*, 118 S.W.3d at 751 (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). More than a scintilla of evidence exists if it "would enable reasonable and fair-minded people to differ in their conclusions." *King Ranch*, 118 S.W.3d at 751 (quoting *Merrell Dow Pharms. Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). A no-evidence summary judgment motion should be denied if the non-movant brings forth more than a scintilla of probative evidence on each challenged element of his claim. TEX. R. CIV. P. 166a(i); s*ee Wal-Mart*, 92 S.W.3d at 506.

**QUESTION OF DUTY**

Midwest argues that more than a scintilla of evidence existed regarding the breach of duty by the Referees. In order to determine whether evidence of a breach existed, we must first examine the parameters of the duty, if any, owed by the Referees to English. Specifically, Midwest asserts that the Referees owed a duty to keep English from encroaching into an area restricted to the officials' use; and further, that Harpole, in particular, owed English a duty to keep a careful, forward lookout for coaches within the restricted area, while simultaneously watching the ball on the field during live play. Midwest relies on: (1) the Restatement (Second) of Torts section 323; and (2) the common law duty to exercise reasonable care to avoid the foreseeable risk of injury to support the existence of the duty owed to English.

## A. Negligence Cause of Action

Midwest's underlying claim against the Referees is based on negligence. There are three essential elements to a negligence cause of action: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from that breach. *Praesel v. Johnson*, 967 S.W.2d 391, 394 (Tex. 1998); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). To prevail on a claim "for negligence, the plaintiff must establish the defendant had a legal duty." *DeGrate v. Executive Imprints, Inc.*, 261 S.W.3d 402, 409 (Tex. App.—Tyler 2008, no pet.) (citing *Graff v. Beard*, 858 S.W.2d 918, 919 (Tex. 1993)). "[T]he existence of [a] duty is a question of law for the court to decide from the facts surrounding the occurrence in question." *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990); *accord Way v. Boy Scouts of Am.*, 856 S.W.2d 230, 233 (Tex. App.—Dallas 1993, writ denied).

A duty is a legal obligation that requires the defendant to conform to a certain standard of conduct. *See Way*, 856 S.W.2d at 233. "Every person has a duty to exercise reasonable care to avoid a foreseeable risk of injury to others." *Lukasik v. San Antonio Blue Haven Pools, Inc.*, 21 S.W.3d 394, 403 (Tex. App.—San Antonio 2000, no pet.) (citations omitted). The Referees contend that no duty exists regarding a risk inherent in the sport of football.

## B. New Arguments on Appeal

Before we address the parties' contentions, we must address Midwest's argument that the Referees did not raise their inherent risk argument in their motions for summary judgment before the trial court and therefore, the argument may not be considered on appeal. "A motion for summary judgment must itself expressly present the grounds upon which it is made, and must stand or fall on these grounds alone." *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 912 (Tex. 1997) (citations omitted); *see also* TEX. R. CIV. P. 166a(c) ("The motion for summary judgment shall state the specific grounds therefor."); TEX. R. APP. P. 33.1(a) ("[T]he record must show that . . . the complaint was made to the trial court by a timely request, objection, or motion . . . "). Trial courts may not grant a summary judgment on grounds not presented, *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 204 (Tex. 2002), and we may not affirm a summary judgment on grounds "not expressly set out in the motion or response." *Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex. 1993).

Midwest asserts that, before the trial court, the Referees' sole argument was that the accident was one-hundred percent English's fault. The Referees, on the other hand, contend their argument was that they owed no duty to English, encompassing a global duty, and more specifically denied that a referee has a duty to a coach in the context of a sporting event. As characterized by Midwest in its brief: "[T]he Referees presented two arguments in support of

their motion: (1) the traditional/legal argument that they owed English no duty; and (2) the no-evidence/factual argument that even if they did owe English a duty, they committed no breach."

Although the Referees' motions for summary judgment do not expressly raise "the risk inherent in the sport of football," it is clear from the context of the motions that the Referees' argument was that they owed *no duty* and breached no duty to English. We, therefore, conclude that this argument encompassed the duty of a referee toward a football coach during live play in a football game, and particularly the circumstances from which the injury arose including the inherent risks of sporting events.[4]

## C. Parties' Assertions Under Restatement (Second) of Torts Section 323

Midwest asserts that the facts surrounding this case call for the application of section 323 of the Restatement (Second) of Torts. By adopting section 323, Midwest argues the Texas Supreme Court confirmed its longstanding view that "one who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured thereby." *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119 (Tex. 1976); *accord Torrington Co. v. Stutzman*, 46 S.W.3d 829, 838-39 (Tex. 2000) (adopting Section 323 Restatement (Second) of Torts). Section 323 of the Restatement (Second) of Torts provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

---

[4] We note that the Referees rely on *Chrismon v. Brown*, 246 S.W.3d 102 (Tex. App.—Houston [14th Dist.] 2007, no pet.), for their arguments regarding inherent risk of sporting events, and that case was issued after the motions for summary judgment were filed.

RESTATEMENT (SECOND) OF TORTS § 323 (1965).

According to Midwest, section 323 applies when the person providing the services, in this case Harpole and the other referees, recognizes that their service is necessary for the protection of coaches such as English. Midwest argues section 323 applies to Harpole's failure to exercise reasonable care when he ran down the sideline full speed without looking where he was going. *See* RESTATEMENT (SECOND) OF TORTS § 323 (1965). Moreover, Midwest contends that English's injuries were a result of Harpole's "failure to exercise reasonable care to perform his undertaking." *Id*. Furthermore, in accordance with section 323's requirement that the actor's failure to exercise reasonable care "increases the risk of such harm," Midwest claims the evidence shows Harpole specifically did not watch where he was going even after "glancing off" another person during his run down the sideline.

The Referees counter that courts have not applied section 323 in the context of injuries in a sporting event, and that Harpole owed no negligence duty to English regarding a risk inherent in the sport of football. Even if the Referees owed a duty to exercise reasonable care, the appellees argue there is no evidence the Referees failed to exercise reasonable care in performing their duties as officials.

## D. Analysis Under Section 323

In this case, Midwest argues that Harpole had a duty to prevent the harm that occurred to English. "Texas law generally imposes no duty to take action to prevent harm to others absent certain special relationships or circumstances." *Stutzman*, 46 S.W.3d at 837. A duty, however, may arise when a person undertakes to provide services to another either gratuitously or for

compensation.[5]   Allegations of a breach of such undertaken duties are often referred to as negligent undertakings claims.

> [T]o establish a claim for a negligent undertaking, a plaintiff must show (1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection, (2) the defendant failed to exercise reasonable care in performing those services, and either (3) the plaintiff relied upon the defendant's performance, or (4) the defendant's performance increased the plaintiff's risk of harm.

*Pugh v. Gen. Terrazzo Supplies, Inc.*, 243 S.W.3d 84, 94-95 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Stutzman*, 46 S.W.3d at 838); *accord Tex. Woman's Univ. v. The Methodist Hosp.*, 221 S.W.3d 267, 284 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see also* RESTATEMENT (SECOND) OF TORTS § 323 (1965).  Thus, under a negligent undertakings claim, Midwest was required to provide at least some evidence that (1) Harpole undertook to perform services that he knew were necessary for English's protection, (2) Harpole failed to exercise reasonable care in providing those services, and (3) English's reliance on Harpole's actions increased the risk of harm to English.[6]

The Referees contend that sporting events, with their inherent risks, should not be analyzed under a negligent undertakings construct.  However, assuming without deciding that a negligent undertakings analysis is appropriate, we believe the Referees established, as a matter of law, that there was no evidence that Harpole failed to exercise reasonable care in refereeing the game thus precluding a negligence claim under section 323.

The summary judgment evidence established that Harpole ran down the sideline at full speed without looking where he was going.  Midwest claims that this is sufficient to raise a fact issue on failure to use reasonable care.  However, we cannot review this evidence without considering the services being provided by Harpole.  The evidence is also undisputed that

---

[5]  This concept is often associated with Good Samaritan cases.  *Stutzman*, 46 S.W.3d at 837.
[6]  Midwest's argument under section 323 is directed toward Harpole's actions.

Harpole was in the midst of refereeing a play, running down the designated referee restricted area, and performing the services for which he had been retained by SAISD. There is no evidence that English's injuries were a result of an improper application or violation of the NCAA rules which govern Harpole's provision of services.

The fact is that Harpole was where he was supposed to be, doing exactly what his job required. For Harpole to perform the essential functions of his duties as a linesman referee, while the ball was in play, he had to focus on the football field and not look for coaches inside the restricted area. The rules governing both coaches and referees require a safe zone for the referee to perform his service in a safe manner. Relying on these rules, Harpole, or a reasonable person performing the duties of a linesman, would not have anticipated the encroachment by English. We, therefore, conclude that Harpole's failure to foresee English's presence in the restricted area is not some evidence of Harpole's failure to exercise reasonable care. Thus, Midwest failed to present any evidence of a necessary element of a negligent undertaking claim—Harpole's failure to exercise reasonable care in providing his services.

**E. Common Law Duty**

Midwest next argues that the Referees owed a duty under the common law to English to exercise reasonable care while officiating high school football games, and that the Referees breached that duty by negligently permitting and encouraging the coaches to stand in an area of the field that the Referees knew or should have known was dangerous. The Referees strongly object to this characterization of the evidence.

*1. Risk-Utility Balancing Test*

Appellate courts apply a risk-utility balancing test in determining whether a duty exists under common law. *See Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 736 (Tex. 1998). In

determining whether a common law duty exists, an appellate court considers the risk, foreseeability, and likelihood of injury, and then weighs these factors "against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Id.*; *accord Avalos v. Brown Auto. Ctr, Inc.*, 63 S.W.3d 42, 47 (Tex. App.—San Antonio 2001, no pet.).

The "foremost and dominant consideration" in determining whether a defendant owes a duty to act reasonably is foreseeability of the risk, that being what a person should, under the circumstances, reasonably anticipate as a consequence of her conduct. *See Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 36 (Tex. 2002); *Garcia v. Cross*, 27 S.W.3d 152, 155-56 (Tex. App.—San Antonio 2000, no pet.). "Foreseeability means that a person who possesses ordinary intelligence should have anticipated the danger that his negligent act would create for others." *Garcia*, 27 S.W.3d at 156; *Boys Clubs*, 907 S.W.2d at 478. "In the absence of foreseeability, there is no duty." *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 954 (Tex. 1996).

"When a duty requires the defendant to exercise reasonable care, the defendant's standard of care is defined as what a 'reasonable prudent person' would or would not have done 'under the same or similar circumstances regarding any reasonably foreseeable risk.'" *Allen ex rel. B.A. v. Albin*, 97 S.W.3d 655, 666 (Tex. App.—Waco 2002, no pet.) (quoting *Colvin v. Red Steel Co.*, 682 S.W.2d 243, 245 (Tex. 1984)). Foreseeability alone, however, is not sufficient to create a duty. *Golden Spread Council, Inc. v. Akins*, 926 S.W.2d 287, 290-91 (Tex. 1996). Ultimately, the test boils down to "what a person should, under the circumstances, reasonably anticipate as the consequences of one's action or failure to act." *Lukasik v. San Antonio Blue Haven Pools, Inc.*, 21 S.W.3d 394, 403 (Tex. App.—San Antonio 2000, no pet.). Therefore, Midwest had to

show that the Referees did not act as "reasonable prudent persons" would have acted in the same or similar circumstances. *See id.*

    *2. Analysis*

        a. <u>The Referees' Duty</u>

Midwest argues the Referees breached a duty to enforce the rules to prohibit coaches from intruding into the restricted area. The Referees testified the NCAA rules were designed, in part, to keep the players, coaches, and officials safe. Moreover, the summary judgment evidence supports Midwest's argument that the services for which the Referees were hired included ensuring the safety of all of the participants, including the sideline observers and the officials. Based on the evidence, Midwest argues that a reasonable person of ordinary intelligence, acting as a referee in a high school football setting, would have anticipated the danger to the participants created by failing to enforce the rules as adopted by the school district. *See Doe*, 907 S.W.2d at 478. Thus, according to Midwest, the Referees were under a duty to enforce the rules as prescribed by the NCAA. Assuming without deciding such a duty existed in the context of a sporting event, we must determine whether there is any evidence the Referees breached this duty.

Midwest relies on the statement of Brackenridge High School Head Coach Willie Hall for the proposition that the referees allowed or encouraged the coaches to use the restricted area during the game in question, in violation of the rules. A closer examination of the testimony, however, reveals that Coach Hall's statement does not support Midwest's position.

> Well, before every ball game, [the Referees] always say "Coaches, keep your coaches back so we can work that area. You guys can work in and out of that area, but that is the officials['] area." So when he's running the sideline, everybody needs to be clear. That's been a point of emphasis the last couple of years because I believe there was an accident, maybe a couple of years ago, that now they're making that a point of emphasis.

It is undisputed that the rules permit the coaches and others to enter the restricted area when the ball is not in play. The foregoing statement does not, however, support the contention that the Referees breached their duty by granting English, or the other coaches, permission to move into the restricted area during "live play."

Furthermore, Midwest's summary judgment evidence actually supports the absence of a breach of duty, rather than a breach. Midwest relies on evidence of the Referees continually instructing the coaches and players to stay clear of the restricted area. One referee testified that he gave verbal warnings "pretty much every play. It's always something that we do every play." This evidence does not support the conclusion that coaches freely entered the restricted area without repercussions. To the contrary, this evidence, combined with Coach Hall's statement, reinforces Midwest's lack of evidence that the Referees breached their duty on the day in question. Midwest simply failed to present any evidence to substantiate a breach of the alleged duty owed by the Referees. We, therefore, overrule Midwest's issue with regard to the Referees.

### b. Harpole's Duty

Midwest further argues that Harpole, individually, owed a duty to English to keep a lookout for anyone encroaching into the restricted area. The very purpose for the restricted area is so that the game referees can run unimpeded down the sidelines, with their heads turned toward the game in progress, without concern that someone is standing within the identified "safe zone." Although Harpole testified that he was running a little "more aggressive[ly] than normal" or a little faster than usual due to another referee's injuries, the fact remains that he was running up and down the sidelines, in a restricted space, while the ball was in play, exactly as his job duties required and the rules allowed. In determining whether a duty existed, we consider the risk, foreseeability, and likelihood of injury. *Read*, 990 S.W.2d at 736. There is no evidence in

the record that Harpole should have foreseen that a coach would violate the rules implemented for his own safety and encroach on the restricted area. Moreover, as discussed above, Harpole was performing the essential functions of his duties as a linesman referee, in a restricted area, while the ball was in play. As such, he was required to focus on the football field and not look for coaches, or other individuals, inside the restricted area. We conclude that a reasonable person of ordinary intelligence in Harpole's position would not have anticipated the danger of injury to English. Accordingly, the record does not substantiate the existence of a duty, based on the common law, owed by Harpole to English.[7] *See Lukasik*, 21 S.W.3d at 403 (recognizing the duty of every person to exercise reasonable care to avoid foreseeable risk of injury to others). Thus, this issue is overruled.

## CONCLUSION

Because the Referees established, as a matter of law, that there was no genuine issue of material fact as to one of the essential elements of Midwest's claims, and Midwest failed to bring forward a scintilla of probative evidence to raise a genuine issue of material fact on an element for which it bears the burden of proof, we affirm the judgment of the trial court.

Rebecca Simmons, Justice

---

[7] Because we hold there is no duty owed by Harpole, we need not address the breach of duty arguments. *See* TEX. R. APP. P. 47.1 (encouraging concise opinions addressing only those issues "necessary to final disposition of the appeal").