

# NUMBER 13-17-00247-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

DINA CAVAZOS,                                              Appellant,

v.

STRYKER SALES CORPORATION,                                Appellee.

### On appeal from the 117th District Court
### of Nueces County, Texas.

# MEMORANDUM OPINION

### Before Justices Contreras, Longoria, and Hinojosa
### Memorandum Opinion by Justice Contreras

Appellant Dina Cavazos filed suit against appellee Stryker Sales Corporation (Stryker) for negligence and assault arising out of an incident in a hospital operating room. The trial court granted Stryker's summary judgment motions and rendered a take-nothing judgment dismissing Cavazos's claims. On appeal, Cavazos argues by one issue that the trial court erred. We reverse and remand.

## I. BACKGROUND

The incident made the subject of the suit occurred on April 19, 2013, in an operating room at Doctors Regional Hospital in Corpus Christi, where Cavazos was working as a nurse. Colby Sample, a sales representative employed by Stryker, was also present in the operating room.[1] According to Cavazos, Sample "caus[ed] his foot to make contact with the back of [Cavazos's] left knee" in order to get her attention while they were preparing for surgery. Cavazos sued Stryker for assault and negligence under the doctrine of respondeat superior.[2]

Stryker filed no-evidence and traditional motions for summary judgment. The former motion alleged that there was no evidence that Sample: (1) breached any duty to Cavazos; (2) acted intentionally, knowingly, or recklessly by making contact with Cavazos's leg; (3) knew or reasonably could have known that Cavazos would regard physical contact with her leg to be offensive or provocative; (4) was acting in the course and scope of his employment at the time of the incident; or (5) caused Cavazos's injuries by his actions. The latter motion alleged that Cavazos's claims fail as a matter of law because: (1) she did not adduce expert testimony to prove causation; (2) her injuries were pre-existing; (3) Sample was not acting in the course and scope of his employment; and (4) Sample did not know and could not have known that Cavazos would regard physical contact with her leg to be offensive or provocative.[3] Stryker attached several

---

[1] As will be discussed more fully herein, Sample sold medical products for Stryker and frequently attended surgeries in which the products he sold were used.

[2] Stryker's live answer to the lawsuit does not appear in the record before this Court.

[3] Stryker's motions further argued that it was entitled to judgment as a matter of law on Cavazos's claims of negligent hiring, training, and supervision. However, those claims do not appear in Cavazos's live petition.

pieces of evidence to its traditional motion, including various deposition transcripts and discovery responses.

In response to Stryker's motions, Cavazos argued that there was more than a scintilla of evidence to show that Sample assaulted her, that he was negligent, that he was acting in the course and scope of his employment at the time of the incident, and that his actions caused her injuries. Her response included full transcripts from the depositions of Cavazos; Sample; and Jon F. Manjarris, M.D., an orthopedic surgeon. After hearings on September 22 and November 8, 2016, the trial court took the matter under advisement.

Subsequently, Stryker filed a supplemental motion for summary judgment arguing that Cavazos's claims are barred because Sample was not served with the lawsuit and the applicable limitations period had expired.

The trial court granted Stryker's summary judgment motions and dismissed all of Cavazos's claims with prejudice. This appeal followed.

## II. DISCUSSION

By one issue on appeal, Cavazos contends that the trial court erred in granting Stryker's summary judgment motions.[4]

### A. Standard of Review

We review summary judgments de novo. *Neely v. Wilson*, 418 S.W.3d 52, 59 (Tex. 2013). Stryker's motions for summary judgment raised both traditional and no-evidence grounds. *See* TEX. R. CIV. P. 166a(c), (i). Though the burden varies for

---

[4] Cavazos also moved for partial summary judgment, and the trial court implicitly denied her motion by dismissing her claims. However, Cavazos does not argue on appeal that the trial court erred in denying her motion; therefore, she has waived that issue. *See* TEX. R. APP. P. 38.1(i), 47.1.

traditional and no-evidence summary judgment motions, because all parties brought forth summary judgment evidence, the differing burdens are immaterial and the ultimate issue is whether a fact issue exists. *Neely*, 418 S.W.3d at 59 (citing *Buck v. Palmer*, 381 S.W.3d 525, 527 & n.2 (Tex. 2012)).

A fact issue exists, precluding summary judgment, if there is more than a scintilla of probative evidence to support each element of the plaintiff's claim. *Id.* Evidence is more than a scintilla if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). Evidence is less than a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion that the fact exists." *Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 603 (Tex. 2010). We review the summary judgment evidence in the light most favorable to the non-movant, indulging every reasonable inference and resolving any doubts against the motion. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).

Because the trial court's order granting summary judgment does not specify the basis for the ruling, we must affirm the judgment if any of the theories advanced in Stryker's motions are meritorious. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

**B.    Summary Judgment Evidence**

As evidence in support of its motion for traditional summary judgment, Stryker attached a hospital report indicating that Cavazos had been treated for "left knee pain" in April 2011 and, after an MRI exam, was diagnosed with (1) a popliteal fossa Baker's cyst, (2) a discoid lateral meniscus, and (3) mild chondromalacia of the medial femoral and

4

tibial plateau articular cartilage.[5]  A second report indicated that Cavazos had another MRI on her left knee in April 2013, shortly after the incident made the subject of this lawsuit.  The April 2013 MRI resulted in additional diagnoses of (1) a partial tear of the lateral collateral ligament and (2) posterior horn medial meniscal degeneration.  A third report showed that Cavazos underwent arthroscopic surgery on her left knee on May 1, 2013.  Under "postoperative diagnoses," the report states:  "Sprain of lateral collateral ligament, discoid lateral meniscus, and osteochondral lesion of medial femoral condyle."[6]

Manjarris, the doctor who performed the arthroscopic surgery in 2013, stated in deposition testimony that he first met Cavazos in 2011 when "she stopped me in the hallway in the hospital and said her knee was hurting and I examined her in one of the exam rooms of the hospital, told her I think she had a problem with her knee and she needed an MRI scan."  In 2012, Manjarris ran in a marathon on the same team as Cavazos.  Cavazos returned to see Manjarris at his office in April 2013, complaining that "she had been kicked in the back of the knee by a kyphoplasty rep at the hospital" and that "her knee was hurting."  He ordered another MRI, which resulted in the diagnoses set forth above.

Manjarris stated that the "osteochondral lesion" referred to in the 2013 postoperative report refers to deterioration of cartilage on the inside top part of the knee, and is the same condition that was described in the 2011 MRI report as chondromalacia. He stated that the popliteal fossa Baker's cyst is usually caused by cartilage damage such

---

[5] The popliteal fossa is "the diamond-shaped area on the skin situated at the back of the knee joint." IDA G. DOX, ET AL., ATTORNEY'S ILLUSTRATED MEDICAL DICTIONARY F39 (West 1997).  A Baker's cyst is "a swelling behind the knee due to a synovial-sac herniation from the knee joint." Id. at C97.  Chondromalacia is "abnormal softening of articular cartilage, especially of the kneecap." Id. at C43.

[6] A condyle is a "knoblike prominence at the end of a bone by means of which it articulates with another bone." Id. at C70.

as chondromalacia, and that a discoid lateral meniscus is a congenital condition that some people are "born with" and is generally "not from trauma," and which can by itself cause pain, stiffness, swelling, and the inability to straighten the knee. According to Manjarris, the discoid lateral meniscus and Baker's cyst diagnosed in 2013 were the same conditions Cavazos had in 2011, and the "posterior horn medial meniscal degeneration" represented "normal wear and tear." When asked whether he recommended surgery prior to 2013, Manjarris replied: "No. . . . I told her if it hurt then she should have surgery, but apparently it quit hurting."

Upon being asked whether he had an opinion as to how Cavazos received the lateral collateral ligament injury, Manajarris explained that Cavazos reported to him that her injuries were caused by a kick to the back of the knee, and he "assume[d] that's how it happened." He later stated that "it could have happened that way" but that it is also "possible" that the injuries were chronic and not caused by trauma. He stated that he recommended surgery in 2013 because he "thought she had an injury." When asked for the basis of that opinion, Manjarris testified:

> I thought that, subjectively, she was complaining of a lot of pain and objectively, we had a—a discoid lateral meniscus and a—a sprained lateral collateral ligament and I thought that her—I, initially, thought it was just her discoid lateral meniscus. I did not expect to find the medial femoral condyle injury that she had. But we don't always find exactly what you're looking for. Sometimes you find more there, you know, and she had—she had more than I thought I—I was hoping she would just have the discoid lateral meniscus injury, which is congenital and it's not really—if she had just had that, I would say that none of this made a difference, being kicked or anything, but with that medial femoral condyle injury and the sprained lateral collateral ligament, that correlates with what she described what happened [sic].

When asked specifically whether he thought the incident on April 19, 2013 was a producing cause of Cavazos's condition, Manjarris stated:

6

She told me that that's when it started hurting. She had had, in 2011, knee pain she told me about and that, I think, was the discoid lateral meniscus and this new injury, possibly caused further damage but she already had the discoid lateral meniscus. That was already there. The medial femoral condyle injury, I think may have happened at that time.

When asked whether Cavazos could have a "dormant" condition that was subsequently "affect[ed]" by a traumatic event, Manjarris replied:

Yes, that's what I thought happened. I thought when she—once—the reason it was hurting is because the discoid meniscus may have flipped or caused the increased pain after she had lost her balance on her knee when the person had kicked her in the leg.

Stryker's motion also included excerpts from the depositions of Cavazos's co-workers Stephanie Barrera and Chris Cardona, and Cavazos's supervisor Linn Bell. Barrera and Cardona each testified that Cavazos had complained prior to April 2013 about pain in her knee. Bell recalled that Cavazos told her prior to April 2013 that "she had a bad knee because she had run into a bed" and that "she had had [a bad knee] for quite some time." Bell stated that Cavazos "always had a little limp because she had bad knees."

Sample stated in his deposition that he sells "interventional spine equipment" for Stryker and frequently attends surgeries, such as kyphoplasties,[7] where the equipment is used. His role during surgeries was "[t]o either bring products, supply product, or to ensure that the product that was there was being utilized correctly." He knew Cavazos because "[s]he was the nurse that would sometimes be in the room if we had surgeries,

___

[7] Kyphoplasty is a surgical procedure used to treat collapsed vertebrae, in which balloons are used to create spaces within the vertebra that are then filled with bone cement. *Vertebroplasty*, MAYO CLINIC, https://www.mayoclinic.org/tests-procedures/vertebroplasty/about/pac-20385207 (last visited Aug. 30, 2018).

7

and I would occasionally ask her to go get contrast or Telfa pads or other supplies." He explained that Telfa pads are used to collect specimens for biopsies.

Sample testified that, on April 19, 2013, the products that Stryker sold which were being used in surgery were "bone cement, cement mixing system, the delivery system for that bone cement, the balloons used to expand the vertebrae, the [needles] used to access the vertebrae . . . and a hand drill to create a void for the balloon channel." He stated that he was walking into the operating room holding supplies in one hand and lead aprons in the other hand, while Cavazos was standing and working at a computer. Sample stated he wanted to get Cavazos's attention because he needed a Telfa pad, so he "tapped [Cavazos] in the back of her leg" with the end of his foot. He stated "it was a very gentle tap." At that point, Cavazos grabbed her leg and complained of knee pain. She then told Sample that she had "knee issues" and showed him that the front of her knee was swollen and bruised. Sample testified:

> And I immediately said, "I did not do that."
>
> She replied back, "No, you didn't. I had hurt my knee playing softball a couple of weeks earlier. I knew I wasn't supposed to. . . . I've had knee problems in the past, and the doctor told me not to play, but I went ahead and did. And then a couple days prior to this, I bumped my knee into a patient bed, and that's why I had the bruise."

According to Sample, when he later visited Cavazos in the emergency room, Cavazos told him: "Don't worry about it. I'm fine. It's not your fault."

Scott Coolack, a surgical technician who was present in the operating room at the time of the incident, stated that it was not part of Sample's job to obtain Telfa pads prior to a procedure; instead, that was the job of the "circulating nurse." He testified: "[I]t's spelled out pretty clear that the reps are there to handle their stuff, and the circulators are there to handle our stuff, for lack of a better word."

In her deposition, Cavazos testified that she started having "discomfort" in her left knee in March 2011 when she was training for a triathlon; however, despite having an MRI and being diagnosed with a discoid meniscus, she continued to compete in running races and other athletic activities.

Cavazos testified that, on April 19, 2013, Sample "kick[ed]" her in the back of the knee, and she disagreed that it was merely a "tap." After it happened, she felt a "pop" and her knee "buckle[d]," so she grabbed on to the computer in front of her and sat down on a stool. She stated that, at that point, she could not straighten her leg or put any weight on it, so she called for her supervisor to relieve her. She then "limp[ed]" to the emergency room. Cavazos stated the "kick" caused her knee to swell "right away"; it caused a bruise to form the next day; and it caused her to need crutches through the summer of 2013. In August of 2013, she had another MRI which revealed a "piece of bone" in her left knee, so she had a second arthroscopic surgery on August 21, 2013 to remove it. She stated she returned to work at a different hospital in 2014, but she no longer runs.

Cavazos stated she did not think Sample intended to hurt her; she agreed that she thought he was "just kind of playing around." When asked why she thought Sample's actions caused her injuries, she replied: "Because I wasn't needing surgery prior to the incident on the 19th."

Cavazos acknowledged in discovery responses that she did not tell Sample prior to the incident that she had an injured knee. She denied in her deposition that she had ever hurt her knee by playing softball or bumping into a patient bed. When asked what she thought Sample's job duties were, she replied: "To bring in implants and to assist the surgeons when their—they needed questions—they had any questions as far as the—

9

the—the handheld cement applicators and so forth. Any kind—any type of questions." She also stated that Sample "acted out of his scope of work" and "was not following his scope of practice."

## C.    Analysis

### 1.    Negligence

To prevail on a negligence claim, a plaintiff must show "a legal duty owed by one person to another, a breach of that duty, and damages proximately caused by the breach." *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009). Stryker's summary judgment motions argued that it was entitled to judgment as a matter of law because Sample did not breach his duty to exercise reasonable care.

"When a duty requires the defendant to exercise reasonable care, the defendant's standard of care is defined as what a reasonable prudent person would or would not have done under the same or similar circumstances regarding any reasonably foreseeable risk." *Mw. Empls. Cas. Co. ex rel. English v. Harpole*, 293 S.W.3d 770, 779 (Tex. App.—San Antonio 2009, no pet.). Foreseeability alone, however, is not sufficient to create a duty. *Golden Spread Council, Inc. v. Akins*, 926 S.W.2d 287, 290–91 (Tex. 1996). Ultimately, the test boils down to "what a person should, under the circumstances, reasonably anticipate as the consequences of one's action or failure to act." *Lukasik v. San Antonio Blue Haven Pools, Inc.*, 21 S.W.3d 394, 403 (Tex. App.—San Antonio 2000, no pet.).

Stryker argued in its no-evidence motion in part that there was no evidence that Sample breached any duty that he owed to Cavazos. We disagree. Although Sample characterized the contact he made with Cavazos as a "very gentle tap" to the back of her

10

knee, Cavazos described it as a "kick," and we are bound at this stage to view the evidence in the light most favorable to Cavazos. *See City of Keller*, 168 S.W.3d 802 at 824. Even though there was no evidence that Sample was aware of Cavazos's pre-existing knee condition prior to the incident, it is reasonably foreseeable that a kick to the back of any person's knee—even a person without a pre-existing condition—would cause that person to suffer a knee injury. Under these circumstances, viewed in the light most favorable to Cavazos, the evidence shows that Sample should have reasonably anticipated that his actions would result in injury to Cavazos. *See Harpole*, 293 S.W.3d at 779; *Lukasik*, 21 S.W.3d at 403. Therefore, there was more than a scintilla of evidence to support a finding that Sample breached his duty of reasonable care to Cavazos.

### 2. Assault

To prevail on a civil assault claim, a plaintiff must establish the same elements as required for criminal assault. *Johnson v. Davis*, 178 S.W.3d 230, 240 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (citing *Moore's Inc. v. Garcia*, 604 S.W.2d 261, 264 (Tex. Civ. App.—Corpus Christi 1980, writ ref'd n.r.e.)). As relevant in this case, a person commits the criminal offense of assault if the person: (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative. TEX. PENAL CODE ANN. § 22.01(a)(1), (3) (West, Westlaw through 2017 C.S.); *see Johnson*, 178 S.W.3d at 240. Under the penal code, "bodily injury" means "physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(a)(8) (West, Westlaw through 2017 C.S.).

Stryker contended in its summary judgment motions that Sample did not know and could not have reasonably known that Cavazos would regard physical contact with the back of her knee to be offensive or provocative. *See id.* § 22.01(a)(3). However, Stryker did not dispute that Sample "intentionally, knowingly, or recklessly" made contact with Cavazos's knee.[8] *See id.* § 22.01(a)(1). Indeed, Sample's testimony establishes that his intent was to make contact with the back of Cavazos's leg in order to get her attention, and there was no contrary evidence. And again, although the magnitude of the contact is hotly disputed, we are required to view all evidence in the light most favorable to Cavazos. *See City of Keller*, 168 S.W.3d 802 at 824. Doing so, we conclude that there was more than a scintilla of evidence showing that Sample "intentionally, knowingly, or recklessly" made contact with Cavazos's knee. *See* TEX. PENAL CODE ANN. § 22.01(a)(1).

### 3. Causation

With respect to both the negligence and assault claims, Stryker contended in its summary judgment motions that Cavazos cannot establish the causation element, for several reasons. *See id.* § 22.01(a)(1), (3) (stating that causation is an element of assault); *Nabors Drilling*, 288 S.W.3d at 404 (stating that causation is an element of negligence).

First, citing cases involving similar knee conditions, Stryker argued that Cavazos was required but failed to provide expert testimony to prove causation. *See Abilene Indep. Sch. Dist. v. Marks*, 261 S.W.3d 262, 268 (Tex. App.—Eastland 2008, no pet.) ("In the absence of expert medical testimony, laypersons do not have the common knowledge

---

[8] Stryker's only challenge to the elements of assault as defined in penal code section 22.01(a)(1) was that Sample's actions did not cause Cavazos's injuries. We address the causation issue *infra* section II.C.3.

and experience to adequately evaluate the cause of [plaintiff]'s chondromalacia. Therefore, expert medical testimony was required to establish causation of the chondromalacia."); *see also Am. Cas. Co. of Reading, Pa. v. Zachero*, No. 11-07-00183-CV, 2008 WL 5205642, at *2 (Tex. App.—Eastland Dec. 11, 2008, no pet.) (mem. op.) (finding that expert testimony is required to establish causation with respect to osteoarthritis and chondromalacia). Stryker contended that Manjarris's deposition testimony shows he did not know the cause of Cavazos's injuries and could not testify with reasonable medical probability that Sample's actions caused those injuries. Moreover, Stryker argued that Cavazos cannot show causation because of the ample evidence that she suffered from knee injuries prior to the incident in question.

Assuming, but not deciding, that expert testimony was required to establish causation in this case, we conclude that the summary evidence was sufficient to raise an issue of material fact as to that issue. It is undisputed that Cavazos had left knee problems prior to the incident made the subject of this suit. However, a close reading of the hospital reports and Manjarris's testimony reveals more than a scintilla of evidence that the problems were exacerbated after her encounter with Sample on April 19, 2013.

The hospital report following Cavazos's 2011 MRI stated that Cavazos was diagnosed with a Baker's cyst, a discoid meniscus, and "mild chondromalacia of the medial femoral and tibial plateau articular cartilage." Following the first 2013 MRI, she was also diagnosed with a partial ligament tear and medial meniscal degeneration. Finally, the report made after her first surgery in 2013 stated that she had a ligament sprain, a discoid meniscus, and an "osteochondral lesion of medial femoral condyle."

13

The Baker's cyst and discoid meniscus appear in both the 2011 and 2013 diagnoses. Moreover, Manjarris testified that the "osteochondral lesion" referred to in the 2013 post-operative report was the same condition as the "mild chondromalacia" referred to in the 2011 post-MRI report. Because these three conditions—the cyst, the discoid meniscus, and the osteochondral lesion—were diagnosed both before and after April 19, 2013, the evidence does not support a finding that Sample's action on that date was the original cause of these conditions.

However, according to the hospital reports, Cavazos was diagnosed with additional conditions in 2013 which did not appear in the 2011 reports—specifically, she was diagnosed with a "partial tear" or "sprain" of the lateral collateral ligament and "posterior horn medial meniscal degeneration" in her left knee. Manjarris testified that the meniscal degeneration was the result of normal wear and tear. But as to the ligament damage, Manjarris stated that Cavazos reported to him that this new injury was caused by a kick to the back of the knee because "that's when it started hurting," and Manjarris stated that the diagnosis of new ligament damage following the 2013 operation "correlates with what [Cavazos] described" as happening. He further opined that Cavazos's discoid meniscus "flipped," causing increased pain, after she lost her balance as a result of the contact to the back of the knee.

Stryker argues that Manjarris's testimony is insufficient to establish causation because such testimony must be based upon reasonable medical probability, not mere possibility. *See, e.g., W.C. LaRock, D.C., P.C. v. Smith*, 310 S.W.3d 48, 57–58 (Tex. App.—El Paso 2010, no pet.) (holding that doctor's testimony did not establish causation because "'[p]erhaps,' 'possibly,' 'can,' and 'could' indicate mere conjecture, speculation

14

or possibility rather than qualified opinions based on reasonable medical probability"). It emphasizes that Manjarris testified it was "possible" that Cavazos's injuries diagnosed in 2013 could be "chronic." However, Manjarris stated at the beginning and end of his deposition testimony that all of his opinions are based on reasonable medical probability. And, logically speaking, an opinion based on reasonable medical probability is not negated by the mere possibility of an alternative theory. That is to say, it can be simultaneously "probable" that Cavazos's injuries were caused by Sample and "possible" that they were not. *See id.* at 56 ("To prove reasonable medical probability, reasonable inferences are permissible, and a plaintiff is not required to exclude every other reasonable hypothesis.").

Stryker further argues that Manjarris's testimony cannot support causation because he relied on Cavazos's description of the incident to arrive at his conclusions. Of course, Manjarris relied to a certain extent on Cavazos's description of historical facts, but he also stated that the objective diagnoses in the post-operative report "correlate" with Cavazos's subjective version of events. In any event, though expert testimony may be required to prove complex medical causation issues, such testimony is not required to establish a sequence of events and subjective experiences such as those recounted by Cavazos. *See LMC Complete Auto., Inc. v. Burke*, 229 S.W.3d 469, 479 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (noting that "it is common for doctors to rely on a patient's history in determining the cause of an injury") (citing TEX. R. EVID. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of, reviewed, or personally observed.")). In other words, though an expert medical witness must use professional judgment in determining whether a particular event caused

a particular injury, we do not expect that expert to use professional judgment to opine as to whether the event happened in the first place. Instead, the expert is entitled to rely on the representations of his lay patient as to the underlying facts, just as a jury would be. Cavazos told Manjarris that her left knee "started hurting" after she was "kicked" on April 19, 2013, and because Cavazos was qualified to make that statement, Manjarris was in turn qualified to rely on it in forming a judgment regarding causation. *See id.* (finding doctor's causation opinion, which was "based in part on the history the patient presented," to be sufficient to support jury's negligence finding where the opinion was "coupled with confirming medical evidence such as the results of medical tests and examination"); *Onwuteaka v. Gill*, 908 S.W.2d 276, 283 (Tex. App.—Houston [1st Dist.] 1995, no writ) (noting that, although "an expert opinion regarding causation that is based completely upon speculation and surmise amounts to no evidence," "[t]he weakness of facts in support of an expert's opinion generally go[es] to the weight of the testimony rather than its admissibility"); *see also Guevara v. Ferrer*, 247 S.W.3d 662, 668 (Tex. 2007) (noting that "[e]vidence of an event followed closely by manifestation of or treatment for conditions which did not appear before the event raises suspicion that the event at issue caused the conditions," and, though "suspicion has not been and is not legally sufficient to support a finding of legal causation," "when combined with other causation evidence, evidence that conditions exhibited themselves or were diagnosed shortly after an event may be probative in determining causation"). Manjarris's reliance on Cavazos's description of the events of April 19, 2013 is therefore not fatal to his causation opinion.[9]

---

[9] The dissent argues that Manjarris's opinion constitutes no more than a scintilla of evidence supporting causation because he did not exclude, with "reasonable certainty," other plausible causes of Cavazos's injuries. *See Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997). But the dissent does not identify any specific alternative

Finally, Stryker contends that causation cannot be shown in light of the overwhelming evidence establishing that Cavazos had a pre-existing left knee condition. But as noted, Cavazos was diagnosed with additional knee ailments after the 2013 MRI and surgery. In any event, Cavazos does not dispute that she suffered from knee conditions prior to April 19, 2013. Instead, she alleges that her pre-existing knee conditions were exacerbated or aggravated by Sample's actions, causing additional pain and necessitating surgery. For the foregoing reasons, a reasonable juror could find, based on the summary judgment evidence, that those allegations are true. We note that, regardless of whether Sample's contact with Cavazos is regarded as a "light tap," a "kick," or something in between, a tortfeasor takes a plaintiff as he finds her. *See Coates v. Whittington*, 758 S.W.2d 749, 752 (Tex. 1988) (the "eggshell skull rule"). The application of this rule means that a tortfeasor may be liable for aggravation of a pre-existing physical condition of the plaintiff caused by the tortfeasor. *See id.*; *see also Pattillo v. Franco*, No. 14-15-00628-CV, 2016 WL 4533508, at *2 (Tex. App.—Houston [14th Dist.] Aug. 30, 2016, no pet.) (mem. op.).

Viewing the summary judgment record in the light most favorable to Cavazos, we conclude that there was more than a scintilla of evidence to support the causation elements of her negligence and assault claims. *See City of Keller*, 168 S.W.3d 802 at 824.

---

"plausible cause" which was supported by the summary judgment evidence and which could have generated the new injuries specified in the April 2013 MRI report. *See Jelinek*, 328 S.W.3d at 536 ("*[W]hen the facts support several possible conclusions*, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence . . . ." (Emphasis added)). Cavazos was under no burden to produce expert testimony to negate alternative causes that are based, at most, on speculation. *See Havner*, 953 S.W.2d at 720 ("*[I]f there are other plausible causes of the injury or condition that could be negated*, the plaintiff must offer evidence excluding those causes with reasonable certainty." (Emphasis added)).

### 4. Course and Scope of Employment

Stryker moved for summary judgment in part on the grounds that Cavazos cannot establish that Sample was acting in the course and scope of his employment at the time of the incident.

Under the doctrine of respondeat superior, an employer will be vicariously liable for the tortious acts of its employee if the employee's actions are within the course and scope of his employment. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007); *DeWitt v. Harris Cty.*, 904 S.W.2d 650, 654 (Tex. 1995). "[A]n employer is liable for its employee's tort only when the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired." *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002). The employee's acts must be of the same general nature as the conduct authorized or incidental to the conduct authorized to be within the scope of employment. *Id.* Accordingly, "if an employee deviates from the performance of his duties for his own purposes, the employer is not responsible for what occurs during that deviation." *Id.*; *see Goodyear*, 236 S.W.3d at 757.

The undisputed evidence shows that, at the time Sample made contact with the back of Cavazos's left knee, he was attending a surgery as a representative of Stryker and wanted to get Cavazos's attention because he needed a Telfa pad, which is used to collect biopsy specimens. Sample testified that, while attending surgeries, his job duties included "bring[ing] products" to operating room staff and "ensur[ing] that the product that was there was being utilized correctly." He stated that, in the past, he would "occasionally ask [Cavazos] to go get contrast or Telfa pads or other supplies."

18

We conclude that this constitutes more than a scintilla of evidence to support a finding that Sample was acting in the course and scope of his employment at the time he made contact with the back of Cavazos's left knee. Although Coolack stated that it was the job of the circulating nurse to obtain Telfa pads, Sample testified that he had asked Cavazos for Telfa pads and other supplies in the past. It is apparent that, when attending surgeries, Sample assisted the staff in ways that extended beyond merely helping surgeons use products he sold to them. In a sensitive environment such as an operating room, we cannot say that his attempt to obtain Telfa pads constitutes a "deviat[ion] from the performance of [Sample's] duties for his own purposes." *See Goodyear*, 236 S.W.3d at 757; *Minyard*, 80 S.W.3d at 577. Instead, the act of making contact with a nurse's leg in order to obtain surgical supplies is "of the same general nature as the conduct authorized or incidental to the conduct authorized" by Stryker. *See Minyard*, 80 S.W.3d at 577. Cavazos's testimony that Sample "acted out of his scope of work" and "was not following his scope of practice" does not alter this conclusion.

### 5. Limitations

Finally, Stryker's supplemental motion sought summary judgment on the grounds that Cavazos's claims are barred by limitations because, although she served Stryker with her lawsuit within two years, she did not serve Sample.[10] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 (West, Westlaw through 2017 1st C.S.) (stating that a personal injury suit must be brought "not later than two years after the day the cause of action accrues"). It bases its argument on the notion that an employer is permitted to assert any of the

---

[10] According to Stryker, Cavazos's original petition named Sample as a defendant, but the only petition contained in the record is Cavazos's fifth amended petition, which Stryker concedes on appeal is Cavazos's live petition and which does not name Sample as a defendant. In any event, there is no dispute that Sample was never served.

employee's defenses when liability is alleged on a respondeat superior theory. *See DeWitt*, 904 S.W.2d at 654 (citing *Cameron Compress Co. v. Kubecka*, 283 S.W. 285, 287 (Tex. Civ. App.—Austin 1926, writ ref'd) (noting that respondeat superior "declares the act of the servant to be the act of the master, and that which excuses or justifies the one will in like manner excuse and justify the other")). Sample, were he a party to the suit, would be entitled to dismissal on the basis of limitations; thus, Stryker contends it is also entitled to dismissal because it may assert any of Sample's defenses. *See id.*

On appeal, Cavazos argues in part that the trial court erred if it granted summary judgment on these grounds because Stryker "fail[ed] to affirmatively plead a statute of limitations defense within all applicable deadlines."[11] We agree. Limitations is an affirmative defense which must be pleaded, or is waived. TEX. R. CIV. P. 94; *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 155 (Tex. 2015). Stryker concedes that it did not plead a limitations defense in its original answer, but it argues that the trial court granted it leave to file an amended answer to include that defense. The record contains a "Motion for Leave to Amend Answer" filed by Stryker but it does not contain an explicit ruling on

---

[11] Cavazos also argues that summary judgment on limitations grounds was improper because (1) Stryker was served with the lawsuit within the limitations period, and (2) Stryker entered into an "enforceable stipulation" in which it agreed it would not pursue a limitations defense. She attached, as an exhibit to her appellate brief, an undated and un-file-stamped copy of a "Stipulation and Agreement" signed by counsel for both parties, stipulating that Sample was employed by Stryker on the date in question, and declaring that Stryker "agrees it will not assert any statute of limitations defense." Stryker argues in response that it merely agreed that it would not assert a defense that "*it* was not timely served" (emphasis added), noting that Cavazos had initially named and served Stryker's "corporate representative" rather than Stryker itself.

We need not determine whether the purported stipulation precludes Stryker's limitations defense because, though the stipulation has been attached as an exhibit to Cavazos's appellate brief, it does not appear in the record before this Court. Therefore, we may not consider it on appeal. *See, e.g., Gonzalez v. Villarreal*, 251 S.W.3d 763, 777 n.17 (Tex. App.—Corpus Christi 2008, pet. dism'd w.o.j.). We also need not determine whether Stryker may assert Sample's limitations defense in this case because of our conclusion that the record does not show that the defense was affirmatively pleaded. *See* TEX. R. APP. P. 47.1.

20

that motion, and it does not reflect that an amended answer was ever actually filed.[12] Accordingly, Stryker waived the defense.

The dissent argues that the limitations issue was tried by consent, and it suggests that Cavazos waived her appellate complaint regarding this defense because the record contains no written response by Cavazos to Stryker's supplemental summary judgment motion. *See Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991) (holding in the summary judgment context that "[t]he party who allows an issue to be tried by consent and who fails to raise the lack of a pleading before submission of the case cannot later raise the pleading deficiency for the first time on appeal"). But trial by consent is intended to cover only the "exceptional" case in which it "clearly appears from the record as a whole that the parties tried the unpleaded issue"; it "should be applied with care" and "is not intended to establish a general rule of practice." *Guillory v. Boykins*, 442 S.W.3d 682, 690 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *In re A.B.H.*, 266 S.W.3d 596, 600 (Tex. App.—Fort Worth 2008, no pet.); *Greene v. Young*, 174 S.W.3d 291, 301 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Here, Stryker first attempted to raise the limitations defense in its motion for leave to amend its answer, filed on September 28, 2016, which was after the initial summary judgment hearing. At the November 8, 2016 hearing, Cavazos's counsel specifically complained that Stryker "never indicated ever in any pleading, in any discovery request, in any request for disclosure that they were gonna

---

[12] At a hearing on November 8, 2016, the trial court indicated that she reviewed the motion for leave and was inclined to grant it, but no explicit ruling appears in the record. We note that the trial court clerk is required to include in the appellate record "all pleadings on which the trial was held." TEX. R. APP. P. 34.5(a)(1). Further, Stryker requested a supplemental clerk's record, but its request did not seek the inclusion of any order granting its motion for leave to amend answer, nor did it seek the inclusion of any amended answer filed pursuant to such an order. *See* TEX. R. APP. P. 34.5(c)(1). We believe the proper assumption in this scenario is that there is no order granting Stryker's motion for leave to amended answer.

assert" the limitations defense. This is not an "exceptional" situation warranting application of the trial-by-consent doctrine. *See Guillory*, 442 S.W.3d at 690; *cf. Roark*, 813 S.W.2d at 495 ("Because Roark failed to direct the trial court's attention to the absence of the pleading in his written response or before the court rendered judgment, this complaint may not be raised on appeal.").[13]

For the foregoing reasons, we conclude that summary judgment based on limitations was improper. *See* TEX. R. CIV. P. 94; *Zorrilla*, 469 S.W.3d at 155.

## III. CONCLUSION

Having found that none of the grounds for summary judgment set forth by Stryker are meritorious, we conclude that the trial court erred in granting summary judgment, and we sustain Cavazos's issue on appeal. The trial court's judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

DORI CONTRERAS
Justice

Dissenting Memorandum Opinion by
Justice Hinojosa.

Delivered and filed the
31st day of August, 2018.

---

[13] The dissent contends that we have "ignore[d]" the rule providing that an appellant "bears the burden to see that a sufficient record is presented to show error requiring reversal." We have not ignored this rule; rather, we have applied it and found that Cavazos has met her burden. In particular, the record before the Court is sufficient to show that the trial court erred because it contains: (1) all of the summary judgment motions, responses, and replies considered by the trial court and relevant to the issues before us, along with the attached evidence; and (2) the trial court's ruling. And crucially, although Stryker's live answer does not appear in the record, Stryker acknowledges on appeal that it did not plead a limitations defense prior to the time it sought leave to amend its answer. Therefore, the inclusion in the record of any prior answers would not affect our analysis.