IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2018 Session

## STATE OF TENNESSEE v. SADEGH BABANZADEH

**Appeal from the Circuit Court for Rutherford County**
**No. F-76074  Royce Taylor, Judge**

_____

**No. M2017-02235-CCA-R3-CD**

_____

The Defendant, Sadegh Babanzadeh, was convicted of one count each of tampering with evidence and filing a false report.  The trial court sentenced him to a five-year sentence for tampering with evidence and a three-year sentence for filing a false report, to run concurrently, with a year to be served in the Department of Correction, and the remainder of the sentences to be served on probation.  The Defendant argues on appeal that the evidence is insufficient to sustain his convictions.  After thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and NORMA MCGEE OGLE, J., joined.

Nicholas W. Utter, Lewisburg, Tennessee, for the appellant, Sadegh Babanzadeh.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Jennings H. Jones, District Attorney General; and John Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On August 3, 2016, a Rutherford County grand jury indicted the Defendant for tampering with evidence and filing a false report, with both charges arising out of an incident at the Defendant's house on January 19, 2016.  Following a bench trial, the

Defendant was convicted on both counts on March 31, 2017. We now review the facts relevant to this appeal.

On January 19, 2016, Deputy Michael Rogers, with the Rutherford County Sheriff's Office, was dispatched to the Defendant's home in response to a report of an unresponsive person. Deputy Rogers testified that when he arrived, the Defendant opened the door and said, "I think she's in there dying[,]" while exhibiting no emotion or distress. As Deputy Rogers and the Defendant walked through the house to get to the unresponsive woman, Ms. Morgan Langham, the Defendant told Deputy Rogers, "[S]he doesn't have a shirt on[,]" which the deputy found to be "an odd statement."

Deputy Rogers testified that he found Ms. Langham on the Defendant's bed, "wearing nothing but black yoga type pants" with her eyes "rolled back into her head." When EMS arrived to care for Ms. Langham, Deputy Rogers, suspecting a drug overdose, asked the Defendant what she might have ingested to help EMS with her medical care. The Defendant gave "evasive answer[s]" and responded that he did not know what she had ingested and that he had just met her. While EMS worked on Ms. Langham, Deputy Rogers expressed to the Defendant that EMS "need[ed] to know exactly what it [was] that she [had] ingested so they [could] treat her properly." The Defendant maintained that he did not know Ms. Langham or what she had ingested. In response, Deputy Rogers explained that the Defendant "wouldn't necessarily be in trouble just because she ingested drugs[,"] and it was "more important that [they] knew what it was so [they] could save her." The Defendant still continued to state that he did not know Ms. Langham or what she had ingested.

After EMS took Ms. Langham to the hospital, Deputy Rogers tried to ascertain her "address, phone number, next of kin, that sort of thing." The Defendant stated that he had met her on Tinder, a dating application. When the Defendant could not find her information on Tinder, he showed the deputy Ms. Langham's Facebook account. When Deputy Rogers asked for her phone number, the Defendant stated that he did not know her phone number, but he did have her parents' information. Deputy Rogers testified that "at that point," he realized that the Defendant "was being untruthful" about his relationship with Ms. Langham. When Deputy Rogers relayed his realization to the Defendant, he admitted that he had been having "a sexual type relationship" with her for "around a month."

The Defendant then asserted that he had taken his dogs for a walk when Ms. Langham arrived at his house, and he found her unresponsive when he returned from the walk. He admitted to Deputy Rogers that she "had probably taken Opana or Suboxone or used heroin." Deputy Rogers then called a detective to the house when it became clear that Ms. Langham might die. Upon learning that a detective was coming to his house, the

Defendant then "changed his story" and told Deputy Rogers that he had watched Ms. Langham use drugs and subsequently become "out of it[.]" The Defendant then asserted that he moved her into his bedroom and noticed that "she had bled from the face on his couch and floor." The Defendant then "went back to clean up the blood and then went to try to give her medical attention." Ms. Langham's friend then began trying to get into contact with her over her telephone and at some point told the Defendant that he needed to call the police and get Ms. Langham medical attention. Deputy Rogers testified that the detective arrived to interview the Defendant, and they subsequently decided to arrest the Defendant for filing a false report. Upon learning he was going to be arrested, the Defendant said he would "tell [them] the truth."

The Defendant then explained how he had watched Ms. Langham ingest heroin, "making rows and snorting it with a rolled up piece of paper." He further explained that she also "used a spoon to crush a rock into powder" and her "driver's license to form that powder into rows and snort it." He became "uncomfortable with her using the drugs" and took his dogs outside for a walk. When he returned, she was unresponsive. He moved her into his bedroom and "began Googling on his phone or looking up information on how to treat her." His Google search history included queries like "how to wake someone from heroin overdose" and "can you just let someone sleep who is overdosed on heroin[.]" He subsequently "sprayed water on her[,]" "placed some frozen bologna sticks on her to try to keep her cool[,]" and "shocked her with a taser in order to try to get her to respond."

Detective Steve Craig, with the Rutherford County Sheriff's Office, testified that he was the detective called to investigate the scene at the Defendant's house. His testimony largely echoed that of Deputy Rogers. He stated that when he arrived at the Defendant's house, Deputy Rogers "explained to [him] that he was having some trouble with the inconsistencies and the story that he got from [the Defendant]." After looking around the house "to ascertain exactly what happened[,]" Detective Craig tried to interview the Defendant. However, the Defendant told him that "he would only speak with [Detective Craig] if he could record everything on his phone." When Detective Craig responded that he would not allow the Defendant to record him, the Defendant told him he "wasn't being flexible."

Detective Craig later tried to interview the Defendant again after speaking with Deputy Rogers. When Detective Craig maintained that the Defendant could not record him, the Defendant responded that "if he wasn't going to allow him to record the conversation . . . then [Detective Craig] didn't care about that girl." He further told Detective Craig that "maybe [he] [could] ask her if she survives . . . what happened at the house that night." The Defendant then "went into a rant" about having his attorney "look into loss of wages for him because he couldn't go to work the next day [because of] the

length of time [the police] were there at this house," claiming the police had been at his house "about five hours." Detective Craig testified that they were only there for around two hours, and the Defendant was self-employed. Detective Craig then arrested the Defendant for filing a false report and tampering with evidence, based on the Defendant's dishonesty and concealing evidence.

After being placed in handcuffs, the Defendant asked Detective Craig and Deputy Rogers, "[W]hat if I told you what happened[?]" The Defendant then relayed that he had invited Ms. Langham to his house, where she had visited before. He watched her "smoke[] or snort[] some heroin or Suboxone[,]" after which he "invited her to bed." After she fell asleep on the couch, he carried her to his bed, which the Defendant described as "the funniest thing ever[.]" When he realized she was bleeding, he cleaned up the blood with a rag, which he then placed "in the corner behind the kitchen door." 60. He then tried to use frozen bologna, water, and a taser to revive her. Ms. Langham's friend then called her telephone, and the Defendant answered. When the friend asked if Ms. Langham was there, the Defendant replied, "I wouldn't say she is because she looks dead[.]" He then began Googling ways to give her medical treatment. Ms. Langham's friend encouraged him to get her help, and he replied, "Don't bring anyone to my house!" and "Don't send an ambulance!" After trying to give her CPR, he called 911. The Defendant further admitted to Detective Craig that he had in fact seen Ms. Langham snort heroin, which she used a spoon to crush and paper to snort. Detective Craig testified that he found the spoon submerged in the sink, the paper in the trash, and the frozen bologna back in the freezer, in addition to the bloody rag in the corner behind the kitchen door.

The Defendant did not present any proof at trial. Following the close of all proof, the trial court convicted the Defendant of tampering with evidence and filing a false report. He was sentenced to a five-year term for tampering with evidence and a three-year term for filing a false report, to run concurrently, with a year to be served in the Department of Correction, and the remainder of the sentences to be served on probation.

## ANALYSIS

On appeal, the Defendant argues that the trial court erred in denying his motion for judgment of acquittal for both his false report conviction and his tampering with evidence conviction. Because the Defendant presented no proof at trial, we employ the same standard as we would in determining the sufficiency of the evidence. See State v. Little, 402 S.W.3d 886, 892 (Tenn. 2013); State v. Willard V. Fleming, No. E2014-01137-CCA-R3-CD, 2015 WL 799778, at *4 (Tenn. Crim. App. Feb. 25, 2015), perm. app. denied (Tenn. June 15, 2015).

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); <u>see also</u> Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); <u>State v. Evans</u>, 838 S.W.2d 185, 190-92 (Tenn. 1992); <u>State v. Anderson</u>, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. <u>See</u> <u>State v. Pappas</u>, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). It is not the role of this court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. <u>State v. Reid</u>, 91 S.W.3d 247, 277 (Tenn. 2002). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). "In a bench trial, the verdict of the trial judge is entitled to the same weight on appeal as a jury verdict." <u>State v. Holder</u>, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999).

## A. False Report Conviction

We initially note that the Defendant's indictment for filing a false report references both Tennessee Code Annotated section 39-16-502(a)(1) and Tennessee Code Annotated section 39-16-502(a)(2). The trial court's verdict relies on the language of Tennessee Code Annotated section 39-16-502(a)(2). The trial court found that the reference to both sections "put[] the Defendant on notice with regard to the charge[,]" and the Defendant does not challenge this finding but instead challenges the sufficiency of the evidence in supporting a conviction under either Tennessee Code Annotated section 39-16-502(a)(1) or Tennessee Code Annotated section 39-16-502(a)(2). Because the Defendant's conviction is based on the language of Tennessee Code Annotated section 39-16-502(a)(2), we will analyze the sufficiency of the evidence to support his conviction based on that statutory language.

Tennessee Code Annotated section 39-16-502(a)(2) sets forth the following relevant definition of filing a false report:

(a) It is unlawful for any person to:
. . . .

(2) Make a report or statement in response to a legitimate inquiry by a law enforcement officer concerning a material fact about an offense or incident within the officer's concern, knowing that the report or statement is false and with the intent to obstruct or hinder the officer from:

> (A) Preventing the offense or incident from occurring or continuing to occur; or
> (B) Apprehending or locating another person suspected of committing an offense[.]

Tenn. Code Ann. § 39-16-502(a)(2).

The Defendant relies on State v. Leia Mellott, No. E2012-00278-CCA-R3-CD, 2013 WL 615215, at *5 (Tenn. Crim. App. Feb. 19, 2013), for the mistaken assertion that he did not give a false statement to police but instead "minimized his knowledge" of who Ms. Langham was and what she had ingested. However, in Leia Mellot, the defendant responded "I don't know" when asked by police if she knew where a suspect was hiding. Leia Mellott, 2013 WL 615215, at *5. The court noted that although the defendant in that case could have provided "a more truthful answer," such an issue was irrelevant to whether she knowingly made a patently false statement. Id. The Defendant further argues that the requisite "offense or incident," namely Ms. Langham's ingestion of heroin, had already been completed. However, the State argues Ms. Langham's overdose was ongoing, and Deputy Rogers and Detective Craig were trying to discover what drugs she had ingested in order to get her medical treatment. Although the statute does not define "incident," Black's Law Dictionary defines incident as a "discrete occurrence or happening; an event, esp. one that is unusual, important, or violent[.]" BLACK'S LAW DICTIONARY (10th ed. 2014). Accordingly, we agree with the State that Ms. Langham's ongoing overdose equates to an incident for purposes of the statute.

The record demonstrates that the Defendant lied to Deputy Rogers and Detective Craig regarding Ms. Langham's identity, their relationship, and what she had ingested when they questioned him about Ms. Langham's overdose. Both Deputy Rogers and Detective Craig testified that their main concern was discovering what Ms. Langham had ingested so that she could receive the correct medical treatment as quickly as possible. Though the Defendant argues that he did not know what she had ingested, and only guessed that it was heroin, the record suggests otherwise. He specifically Googled questions regarding a heroin overdose and told police that he had watched Ms. Langham ingest the heroin. He was told the importance of discovering what she had ingested for her treatment and still maintained that he did not know what she had taken until he realized he was in trouble with police. Such a fact was undoubtedly material to Deputy Rogers and Detective Craig's investigation.

Finally, the Defendant argues that there is no evidence to support an intent to obstruct or hinder Deputy Rogers' and Detective Craig's preventing the incident from continuing. However, the record suggests otherwise. The Defendant initially used Google, water, frozen bologna, and a taser to try to treat Ms. Langham's overdose. He further told Ms. Langham's friend not to send an ambulance or anyone else to his house. When police and EMS arrived at his house, the Defendant gave evasive and patently false answers to police questioning. He refused to speak to Detective Craig unless he could record their conversation, called him inflexible, and ranted about hiring an attorney to compensate him for his lost wages due to the police questioning. He only told Deputy Rogers and Detective Craig what Ms. Langham had ingested when he was placed in handcuffs and realized he was in trouble. Thus, a rational trier of fact could have found intent to hinder the investigation into what Ms. Langham had ingested in order to treat her overdose. Despite the Defendant's arguments to the contrary, the record supports his false report conviction. Viewed in the light most favorable to the State, the record demonstrates that the Defendant made knowingly false statements to Deputy Rogers and Detective Craig regarding what Ms. Langham had ingested in order to hinder their investigation into her ongoing overdose. A rational trier of fact could easily find as such. The Defendant is not entitled to relief.

## B. Tampering with Evidence Conviction

Tennessee Code Annotated section 39-16-503(a)(1) sets forth the following definition of tampering with evidence:

> (a) It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress to:
> (1) Alter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding[.]

Tenn. Code Ann. § 39-16-503(a)(1).

Our supreme court has stated that the statute requires the State to prove "timing, action, and intent" beyond a reasonable doubt. State v. Hawkins, 406 S.W.3d 121, 132 (Tenn. 2013) (quoting State v. Gonzales, 2 P.3d 954, 957 (Utah Ct. App. 2000)). To satisfy the timing requirement, the defendant must first form a belief that an investigation is "pending or in progress," which our supreme court has clarified to include "impending" investigations. Id.; State v. Smith, 436 S.W.3d 751, 763-65 (Tenn. 2014). The action requirement mandates that the State prove "alteration, destruction, or concealment." Hawkins, 406 S.W.3d at 132. Finally, to satisfy the intent requirement, the State must prove that the defendant intended "to hinder the investigation or official

- 7 -

proceeding by impairing the record's, document's or thing's 'verity, legibility, or availability as evidence.'" Id. (quoting Tenn. Code Ann. § 39-16-503(a)(1)). The State is not required to identify the exact "thing" tampered with, and "thing" is defined broadly. Id. Tampering with evidence is a specific intent crime. Id.

The Defendant argues that there was no pending or impending investigation until he called 911. However, our supreme court has held that a defendant who initiated an investigation by calling 911 knew that an investigation was "impending" before he ever contacted police. See Smith, 436 S.W.3d at 765. This court has also repeatedly found that a defendant who observes an offense being committed has knowledge of an impending investigation even before police ever discover the offense. See, e.g., State v. Travontay Tremont Berry, No. W2014-00801-CCA-R3-CD, 2015 WL 1951885, at *4 (Tenn. Crim. App. Apr. 30, 2015). The Defendant further argues that there is nothing in the record to demonstrate that he intended to alter, destroy, or conceal evidence.

Viewed in the light most favorable to the State, the record supports the Defendant's conviction for tampering with evidence. With respect to the timing requirement, a rational trier of fact could have easily found that the Defendant knew an investigation was impending. He watched Ms. Langham overdose on heroin, and instead of initially calling 911, he Googled how to treat a heroin overdose. He told Ms. Langham's friend not to call police or send an ambulance. Before police arrived, the Defendant had cleaned up Ms. Langham's blood and hidden the evidence of his cleaning it up in a corner behind a door. The record also supports the inference that he cleaned up any other evidence of drug use in the house, including throwing away the paper used to snort the heroin and submerging the spoon used to crush the heroin in the sink. The Defendant put the bologna he had placed on Ms. Langham back in the freezer. Based on his evasive answers in response to police questioning and his statements to Ms. Langham's friend, a rational trier of fact could conclude that the Defendant knew an investigation was impending, and in response, took steps to prevent police from discovering what Ms. Langham had ingested and to keep himself out of trouble, satisfying the action and intent requirements. The Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE